**In re CONNER CORPORATION.**

**FEDERAL DEPOSIT INSURANCE CORPORATION, Appellant,**

v.

**Algernon L. BUTLER, Jr., Trustee in Bankruptcy, and Unsecured Creditors' Committee, Appellees.**

No. 90–488–CIV–5–H.

United States District Court,
E.D. North Carolina,
Raleigh Division.

Feb. 15, 1991.

James Jerome Hartzell, Graham & James, Raleigh, N.C., for Federal Deposit Ins. Corp.

Algernon L. Butler, Jr., Wilmington, N.C., for Algernon L. Butler, Jr., Trustee in Bankruptcy.

Trawick Hamilton Stubbs, Jr., New Bern, N.C., for Unsecured Creditors' Committee.

## ORDER

MALCOLM J. HOWARD, District Judge.

This matter is before the court pursuant to 28 U.S.C. § 158(a) on the appeal of the Federal Deposit Insurance Corporation ("FDIC") from an order of the United States Bankruptcy Court. 1990 WL 124052. The bankruptcy judge, the Honorable Thomas M. Moore, granted the summary judgment motion of the trustee and the Unsecured Creditors' Committee and upheld their objections to the FDIC's claim. For the reasons discussed below, this court affirms the order of the bankruptcy court.

## FACTS

In June 1984, the Conner Corporation ("Conner") acquired Sun Savings and Loan Association. Sun Savings subsequently became known as Cardinal Savings Bank, Inc. ("Cardinal"). Conner filed for bankruptcy on July 2, 1987, and the FDIC asserted an unsecured claim against the bankruptcy estate. The FDIC's claim arises out of Cardinal's application for FSLIC deposit insurance. The Federal Home Loan Bank Board ("Bank Board") granted conditional approval of that application on January 17, 1986:

IT IS HEREBY RESOLVED, that said applications are hereby approved provided that the applicant has complied with the following conditions in a manner satisfactory to the Supervisory Agent at the Federal Home Loan Bank of Atlanta not later that six months from the date of this Resolution ... and that the applicant has:

1. Submitted an agreement to increase and maintain its net worth (as determined pursuant to Section 563.13 of the Insurance Regulations), at an amount equal to the greater of five percent of total liabilities ... or the amount required by Section 563.13(b) of the Insurance Regulations....

.      .      .      .      .

20. Filed the required holding company application prior to the association's receipt of FSLIC insurance, and has stipulated to the Supervisory Agent that the parent holding company will take whatever reasonable action is deemed necessary by the Supervisory Agent to complete the application process and to facilitate approval of such holding company application; *further, the parent holding company has agreed, in writing, to*

*maintain the association's net worth at the level required by Condition No. 1 above and will infuse sufficient additional equity capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement....*

FSLIC Resolution No. 86–44 (emphasis added).

Conner, as the holding company of Cardinal, agreed to maintain the net worth of Cardinal at levels prescribed by the FSLIC resolution. This agreement is evidenced by a letter to the Bank Board from Conner, which states in part:

Conner Corporation further agrees that, if necessary, it will infuse sufficient additional equity capital, in a form satisfactory to the Principal Supervisory Agent, into [Cardinal] so as to maintain its net worth at the greater of five percent of total liabilities ... or the amount required by Section 563.13(b).

The FSLIC subsequently issued deposit insurance. On May 13, 1988, the Bank Board found Cardinal to be insolvent and appointed the FSLIC as its receiver. The FSLIC paid out over $82,000,000 to Cardinal depositors. The FDIC has since replaced the FSLIC and stands in its shoes pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA").

The FDIC asserts that a contract was formed between the Bank Board and Conner by which the Bank Board would grant Cardinal's application for deposit insurance in consideration for, among other things, the agreement of Conner to infuse capital into Cardinal if necessary. The FDIC contends that Conner never complied with its obligations. According to the FDIC, Cardinal is a third-party beneficiary of this contract, and the FDIC now asserts, as receiver for Cardinal, the rights of Cardinal against Conner's trustee in bankruptcy.

The FDIC asserted a claim for $10,900,-000 on November 7, 1987, the deadline for filing claims. An amended claim for $50,-000,000 was filed on October 2, 1989. The trustee and the Unsecured Creditors' Committee objected to the claim and the amended claim. The bankruptcy court sustained those objections, ruling that there was no contract between Conner and the Bank Board.[1]

## DECISION

### A. Applicable Law

The first issue is whether North Carolina state law or federal common law applies to the contract issues in this case. The bankruptcy judge applied state law based on *FSLIC v. Capozzi*, 855 F.2d 1319 (8th Cir. 1988), *vacated on other grounds*, 490 U.S. 1062, 109 S.Ct. 2058, 104 L.Ed.2d 624 (1989). The FDIC strenuously urges the court to look to federal common law; the appellees argue just as strenuously that state law applies.

The court notes first that *Capozzi* is not dispositive. The court in *Capozzi* held only that state law applies to private litigation between a state-chartered thrift institution and its directors. 855 F.2d at 1325. The issue in this case, however, is what law determines whether an agency of the federal government, acting in its regulatory capacity, has contracted with a private corporation.

■ The FDIC refers the court to 12 U.S.C. § 1730(k)(1), which provides that "any civil action, suit, or proceeding to which [the FSLIC] shall be a party shall be deemed to arise under the laws of the United States." The FDIC contends that since this action arises under federal law, that federal common law should apply to this question. Section 1730(k)(1), however, is merely jurisdictional. *See* 28 U.S.C. § 1331. It grants the federal courts jurisdiction over such suits, but does not address the question of whether federal or

---

1. Because the court affirms the finding that there was no contract, it is not necessary to address the alternative grounds given by the bankruptcy judge in support of his decision. Specifically, he ruled that even if a contract existed between Conner and the Bank Board, Cardinal was not a third-party beneficiary of the contract. He also ruled that the claim of the FDIC was not timely filed.

state law applies to the various subsidiary issues in the case. This litigation "arises under" federal bankruptcy law. That fact, however, has nothing to do with whether federal or state law applies to the particular question before the court. The case of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), applies to federal question cases as well as diversity cases. 19 Wright, Miller, and Cooper *Federal Practice and Procedure: Jurisdiction,* § 4515.

The court relies instead on *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), in which the Court held that federal common law governs the rights and duties of the United States on commercial paper it issues. Similarly, federal common law should govern the contractual rights of the United States arising out of the conduct of its agencies. *United States v. Seckinger*, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970) (federal law governs interpretation of contract between United States and contractor). Applying state law would subject identical transactions of the United States to the "vagaries of the laws of the several states." *Clearfield Trust*, 318 U.S. at 367, 63 S.Ct. at 575. Net worth maintenance agreements were widely used by the Bank Board, and continue to be used by its successor, the Office of Thrift Supervision. A uniform rule is necessary for federal regulators to know to what extent holding companies can be required to recompense the government for failing to abide by the net worth agreements.

The appellees assert that federal law should not apply because the FDIC is not asserting a claim on its own behalf, but merely as a receiver for Cardinal. Federal law applies, however, because the federal government was a party to the alleged contract, not because the FDIC is the receiver for Cardinal. The appellees attempt to distinguish *Clearfield Trust* by asserting that the Bank Board was in a regulatory, not a contractual, relationship, with Conner. That begs the question, however, because the issue is whether their relationship was, in fact, contractual, and that issue should be resolved by federal law.[2]

## B. Existence of a Contract Between Conner and the Bank Board

The Bankruptcy Court found that Conner and the Bank Board did not enter into a contract. The court stated that Conner merely agreed to comply with the regulatory requirements of the Bank Board, and that upon its failure to do so, it was subject to the regulatory authority of the Bank Board, but not to an action for breach of contract. The bankruptcy court found that the parties did not intend to enter into a contract and that there was no consideration from the Bank Board to support a contract.

The appellees assert that the relationship between Conner and the Bank Board was regulatory, not contractual. This court, however, agrees with the FDIC's contention that there is no strict dichotomy between that which is regulatory and that which is contractual. Certainly there are circumstances in which the Bank Board, acting in its regulatory capacity, can enter into contractual relationships. For example, in *Security Federal Sav. Bank v. Director, Office of Thrift Supervision*, 747 F.Supp. 656 (N.D.Fla.1990), the court held that a contract had been entered into by the Bank Board and a savings and loan. The parties engaged in extensive negotiations in an effort to avoid placing the savings and loan in receivership. The agreement they reached called for the directors of the savings and loan to invest

2. The parties have pointed to no conflicts between North Carolina contract law and federal contract law. Indeed, one would not expect to find a conflict because the case turns on basic contract principles, i.e., the existence of an offer, an acceptance, consideration, and the rules regarding third-party beneficiaries. For example, the FDIC cites as evidence of federal common law on third-party beneficiaries section 302 of the *Restatement (Second) of Contracts.* North Carolina also applies that section. *Snyder v. Freeman*, 300 N.C. 204, 266 S.E.2d 593, 604 (1980). Nevertheless, as discussed below, the court relies primarily on recent federal cases. The court finds, however, that the principles discussed in these cases are in accord with North Carolina law.

$3.6 million of their own money in the institution in exchange for the promise of the Bank Board to allow the institution to include deferred loan losses in its regulatory capital. The promise of the Bank Board was enforceable even after Congress subsequently disallowed deferred loan losses as a component of regulatory capital. Thus, although the Bank Board was acting in its regulatory sphere, a contract had been formed. *See also Century Federal Sav. Bank v. United States*, 745 F.Supp. 1363 (N.D.Ill.1990); 12 U.S.C. § 1725(c)(3) and (4) (granted FSLIC power to make contracts and to sue and be sued). Labeling the conduct of the Bank Board as regulatory does not resolve the issue of whether that conduct also created a contract.

In *Resolution Trust Corp. v. Tetco, Inc.*, 758 F.Supp. 1159 (W.D.Tex.1990), no contract was found on facts similar to those of the case at bar. Tetco, Inc., the holding company of Bexar Savings Association, agreed to maintain Bexar's net worth at "minimum regulatory levels" and to infuse capital as necessary to comply with this net worth requirement. The court stated that: "The terms of the net worth agreement and the regulatory approvals were never the subject of negotiations between the parties; their scope and effect were preordained to the letter by the regulations." *Tetco*, at 1162–63. It is uncertain whether the court was correct in its assertion that the agreement was "preordained to the letter by the regulations" because the terms of that agreement do not appear in the court's opinion.

▮ The *Tetco* court was correct, however, in its identification of the issue. If the terms of the agreement between Conner and the Bank Board were defined wholly by federal regulations instead of the give-and-take of negotiation, it is less likely that a contract was formed. The court is not saying that negotiation is an essential element of a contract. To have a contract there need only be an offer, an acceptance, and consideration. There must be a mutual manifestation of assent, and parties may manifest that assent without formal or extensive negotiation. In this circumstance, however, the origin of the terms of the agreement between Conner and the Bank Board is relevant to the issue of whether they manifested an intention to enter into a contract. Thus, the *Security Federal* court properly found a contract to exist where the mutual promises, an investment of $3.6 million in exchange for permission to carry deferred loan losses as regulatory capital, were independently arrived at by the parties and were not preordained by the regulations.

▮ The essential term of the agreement at issue is Conner's promise to maintain the net worth of Cardinal. The origin of this obligation is Insurance Regulation 574.-8(a)(iv)(A), which provides in part:

(a) *Actions by the Principal Supervisory Agent—(1) Approval.* The Principal Supervisory Agent is authorized to grant approval of any application filed under § 574.3(a) of this part; ... *Provided, that the following conditions are met;*

. . . .

(iv) Where the acquiror is a company, the company is willing to agree in writing that:

(A) It will ensure that its subsidiary insured institution shall have, at the end of each calendar quarter, net worth at least equal to the amount that may be required pursuant to § 563.13 of this chapter, and that where necessary, the company will infuse additional equity capital in a form satisfactory to the Supervisory Agent....

The FDIC correctly contends that Conner did not have to submit to a net worth maintenance agreement; it was required to do so only to obtain expedited approval of their application by the Principal Supervisory Agent. Conner could have avoided this commitment by waiting for approval by the Bank Board itself.

▮ After Conner submitted its Application H–(e)1 to continue as corporate parent of Cardinal, supervisory agent David S. Goodson informed Conner that "additional information is necessary in order to comply with applicable regulatory requirements and in order that the application may be

deemed sufficient for filing." (Letter, April 18, 1986, Exhibit 3 to Appellees' February 4, 1991 Response). The letter also noted that Conner needed to determine "whether its application may be processed by the Principal Supervisory Agent ... pursuant to Insurance Regulation 574.8."

Conner responded by a letter dated May 15, 1986, in which it complied with section 574 and agreed to maintain the net worth of Cardinal at the level required by section 563.13(b). (Exhibit 4, Appellees' February 4, 1991 Response). Thus, it appears that Conner chose to pursue the route authorized by section 574 and agreed to comply with its requirements. By so agreeing, Conner did not manifest an intention to enter into a contract with the Bank Board. As the *Tetco* court stated, Conner's obligations were dictated by a "regulatory blueprint." That Conner could have avoided this obligation by choosing another path through the application process does not change the wholly regulatory nature of this obligation.

The court finds, therefore, that there was no bargained for consideration and no mutual manifestation of assent:

> There was no consideration from [the Bank Board] to Conner or Cardinal to support Conner's agreement to maintain Cardinal's net worth. Such agreement was merely a part of the process of applying for federal insurance on the deposits in the subsidiary.

Bankruptcy Court Opinion, p. 7, 1990 WL 124052 at *4. Conner, by acknowledging the existence of certain federal regulations and by agreeing with the Bank Board to comply with those regulations, did not make a promise sufficient to support a contract and did not manifest an intention to enter into a contract.

■ The court does note, however, that one aspect of Conner's agreement does not appear in the regulations. The Bank Board's resolution required Conner to agree in writing that it would maintain Cardinal's net worth at five percent of total liabilities or the amount required by section 563.13(b) of the Insurance Regulations. Nothing in the regulations refers to a hold-ing company maintaining indefinitely an institution's net worth at five percent of its liabilities. Indeed, this "five percent provision" does not appear in all net worth maintenance agreements. *See FSLIC v. Savers, Inc.*, No. LR-C-89-529, 1989 WL 248120 (E.D.Ark. Dec. 13, 1989); *In re The Securities Groups*, 116 B.R. 839 (Bankr.M. D.Fla.1990). According to the FDIC, the provision is often greater that the requirement of section 563.13 and is easier to calculate. There is no evidence as to why it was included in this instance. It was not negotiated by the parties; rather, it was required by the Bank Board and accepted without comment by Conner.

Although this provision does not derive directly from the regulations and presumably was negotiable, the court does not believe that its inclusion is sufficient to transform this regulatory obligation into one that is also a contractual obligation. The essence of the relationship between the Bank Board and Conner is wholly regulatory. Conner applied, on behalf of Cardinal, for federal deposit insurance; the Bank Board responded by noting deficiencies in Conner's application and informing it of its options under the Insurance Regulations; Conner then agreed to comply with certain of these regulations. Nothing in this sequence of events evidences a mutual manifestation of intent to enter a contract. The inclusion of the five percent provision by the Bank Board is insufficient, by itself, to change what is essentially a regulatory relationship into a contractual relationship.

■ The court asked the parties to address the effect, if any, of the Crime Control Act of 1990, P.L. 101-647, 104 Stat. 4789. The court has reviewed the responses of the parties and is satisfied that the Act has no effect on this appeal. Part of the Act changes the priorities of claims in bankruptcy proceedings. It does not, however, address the issue of which claims are valid and which are invalid. The court has found that as a matter of common law no contract existed between Conner and the Bank Board. The Crime Control Act of 1990 does not purport retroactively to cre-

ate contract rights where none existed before.

The FDIC contends that these amendments evidence a prior understanding of Congress that the FDIC has the right to prosecute deficiency claims on net worth amendments. The appellees correctly point out, however, that the FDIC has never filed a claim on its own behalf. Its only claim is a contractual claim through Cardinal as a third-party beneficiary. The Crime Control Act does not create common law contractual rights on behalf of Cardinal or its receiver.

Accordingly, the decision of the bankruptcy court granting the summary judgment motion of the trustee and the Unsecured Creditors' Committee is AFFIRMED.