**In re OVERLAND PARK FINANCIAL CORPORATION, Debtor.**

**Bankruptcy No. 94–21190–11.**

United States Bankruptcy Court,
D. Kansas.

Feb. 5, 1998.

Benjamin F. Mann, Kathryn B. Bussing, Blackwell, Sanders, Matheny, Weary & Lombardi, L.C., Kansas City, MO, for Debtor.

Martin Jefferson Davis, Teresa A. Scott, Washington, DC, Joann E. Corpstein, Overland Park, KS, for Office of Thrift Supervision.

Robert D. Lantz, Steven M. Leigh, Cynthia C. Dunham, Berry F. Laws, III, Martin, Leigh & Laws, P.C., Erlene W. Krigel, Krigel & Krigel, P.C., Kansas City, MO, for Resolution Trust Corporation and its Statutory Successor, Federal Deposit Insurance Corporation.

## MEMORANDUM OPINION[1]

JOHN T. FLANNAGAN, Bankruptcy Judge.

Congress added § 365(o) to the Bankruptcy Code with the Crime Control Act of 1990.[2] The new subsection addresses "capital main-

---

**1.** Debtor Overland Park Financial Corporation appears by its attorneys, Benjamin F. Mann and Kathryn B. Bussing of Blackwell Sanders Matheny Weary & Lombardi, L.C., Kansas City, Missouri. The Office of Thrift Supervision appears by its attorneys, Martin Jefferson Davis and Teresa A. Scott, Washington, D.C., and Joann E. Corpstein, Overland Park, Kansas. The Resolution Trust Corporation and its statutory successor, the Federal Deposit Insurance Corporation, appear by their attorneys, Robert D. Lantz, Steven M. Leigh, Cynthia C. Dunham, and Berry F. Laws III of Martin, Leigh & Laws, P.C., Kansas City, Missouri, and Erlene W. Krigel, Krigel. & Krigel, P.C., Kansas City, Missouri.

**2.** Crime Control Act of 1990, P.L. 101–647, Title XXV, § 2522(c), 104 Stat. 4866 (1990).

tenance commitments" under the broader section heading of "Executory contracts and unexpired leases." These commitments are "net worth maintenance stipulations" that financial regulatory agencies demand from companies that hold the stock of banking and thrift institutions. Subsection 365(o) directs that in Chapter 11 cases, capital maintenance commitments are deemed assumed and must be immediately cured:

> In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Director of the Office of Thrift Supervision, the Comptroller of the Currency, or the Board of Governors of the Federal Reserve System, or its predecessors or successors, to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507. This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.[3]

As directed in a Federal Home Loan Bank Board resolution, Overland Park Financial Corporation gave Overland Park Savings & Loan Association a net worth maintenance stipulation. I hold that the net worth maintenance stipulation in this case is not an enforceable contract; therefore, it is not a capital maintenance commitment subject to § 365(o).[4]

### Background

Overland Park Financial Corporation ("Financial" or "the debtor") is the parent of Overland Park Savings & Loan Association ("Association"), a Kansas thrift institution.

The Office of Thrift Supervision ("OTS") placed the Association into conservatorship in 1992.

In 1979, Financial applied to the Federal Savings and Loan Insurance Corporation ("Corporation" or "FSLIC") for approval to acquire control of the Association. As the operating head of FSLIC, the Federal Home Loan Bank Board ("FHLBB" or "Board") granted conditional approval of the acquisition in Resolution No. 79–143 on February 21, 1979. Paragraph four of the resolution conditioned approval on Financial's stipulating that it would maintain the net worth of the Association:[5]

> 4. Financial shall stipulate to the Corporation that it (Financial) will cause the net worth of the Association to be maintained at a level consistent with that required by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts ("Regulations"), as now or hereafter in effect, and where necessary, that it will infuse sufficient additional equity capital to effect compliance with such requirement in a form satisfactory to the Corporation.

To comply with this condition, Financial sent the FSLIC a stipulation that mirrored the resolution:

### STIPULATION TO THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

Overland Park Financial Corporation, a Missouri corporation, hereby stipulates to the Federal Savings and Loan Insurance Corporation (the "Corporation") that it will cause the net worth of Overland Park Savings and Loan Association, Overland Park, Kansas, to be maintained at a level consistent with that required by Section 563.13(b) of the Rules and Regulations for

---

3. Congress amended § 365(o) in 1994 by substituting the phrase "a Federal depository institutions regulatory agency (or predecessor to such agency)" for the agencies named in the original version.

4. The parties stipulated in the Partial Pretrial Order filed December 14, 1995, that venue is properly laid in this District, that the United States Bankruptcy Court for the District of Kansas has jurisdiction of the parties and the subject

matter, and that it may try the matter to final order. The Court finds independently of the stipulation that this proceeding is core under 28 U.S.C. § 157 and that the Court has jurisdiction under 28 U.S.C. § 1334 and the general reference order of the District Court effective July 10, 1984 (D.Kan. Rule 83.8.5).

5. Resolution No. 79–143 is attached as Appendix A.

Insurance of Accounts, as now or hereafter in effect, and where necessary, that it will infuse sufficient additional equity capital to effect compliance with such requirement in a form satisfactory to the Corporation.

Dated: April 24, 1979.

OVERLAND PARK FINANCIAL CORPORATION

By /s/ *Clarke L. Henry, President*

Clarke L. Henry, President

Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), effective August 9, 1989.[6] In this Act, Congress created the Office of Thrift Supervision ("OTS") within the United States Department of the Treasury. FIRREA restructured the regulatory scheme for financial institutions and replaced the FHLBB with the OTS as the regulator of depository institutions.

The OTS notified the Association on June 8, 1990, that a recent examination had revealed the Association failed to meet minimum capital requirements.[7] In response, the Association wrote to Financial on September 13, 1990, requesting a capital contribution under the stipulation.[8] In a reply letter of November 5, 1990, Financial stated that it was not inclined to make the requested capital contribution in light of the current economic and regulatory environment and the prevailing sentiment of investors. Financial further stated that it had considered certain issues pending in the litigation challenging the Franklin Savings Association conservatorship, then on appeal,[9] and that depending on the outcome of that litigation, Financial might reconsider its decision not to make a capital contribution to the Association.[10]

The OTS issued a Capital Directive to Financial on December 16, 1991, calling for it to comply with its stipulation.[11] Although Financial failed to honor the Capital Directive, it claims to have attempted eight separate times to infuse capital into the Association, and it suggests that the OTS failed to cooperate in good faith with those efforts.[12] Financial's last such attempt involved capital offered in the form of "purchase mortgage servicing rights" through an entity called Advance Financial, Inc. ("AFI"). AFI allegedly wrote to the Midwest Regional Office of the OTS on September 28, 1992, asking for preliminary clearance to pursue the acquisition of the Association.[13] The OTS wrote back to AFI on November 3, 1992, requesting extensive additional information and stating, *inter alia*, that it was unwilling to recommend to its Washington office acceptance of a non-cash contribution of capital.[14]

A week later, on November 13, 1992, the Director of the OTS appointed the Resolution Trust Corporation ("RTC") as receiver for the Association on grounds that the Association lacked sufficient capital and was therefore in an unsafe and unsound condition to transact business.[15] At the time of the

**6.** Pub.L. 101–73, 103 Stat. 183 (1989).

**7.** Partial Pretrial Order filed December 14, 1995, Stipulation No. 5, at 4.

**8.** Partial Pretrial Order filed December 14, 1995, Stipulation No. 6, at 4.

**9.** Franklin Savings Association was a Kansas savings and loan association that had recently been placed into conservatorship. Its holding company had sued the regulatory authority contending that the conservatorship was wrongfully imposed.

**10.** Partial Pretrial Order filed December 14, 1995, Stipulation No. 7, at 4.

**11.** Partial Pretrial Order filed December 14, 1995, Stipulation No. 11a, at 5. The Pretrial Order stipulations give no details about the Capital Directive, and the OTS has not argued that the Directive created any liability upon which its claim could be based.

**12.** Partial Pretrial Order filed December 14, 1995, subparagraph 8. C., at 15–16.

**13.** Partial Pretrial Order filed December 14, 1995, Stipulation No. 9, at 4.

**14.** Partial Pretrial Order filed December 14, 1995, Stipulation No. 10, at 5.

**15.** Stipulation No. 11 at page 5 of the Partial Pretrial Order filed December 14, 1995, states:

On November 13, 1992, the Director of OTS appointed the Resolution Trust Corporation ("RTC") as receiver for OPSL on each of the following grounds:
a. OPSL was in an unsafe and unsound condition to transact business due to having

RTC's appointment as receiver, the Association was reporting a risk-based capital deficiency of at least $4,073,000, a core capital deficiency of at least $3,767,000, and a tangible capital deficiency of at least $567,000.[16]

According to the stipulations in the Partial Pretrial Order filed December 14, 1995, the Association failed to challenge the receivership appointment.[17] At no time since the receivership appointment has the Association transacted any business.[18] Financial has not infused capital into the Association since its original refusal letter of November 5, 1990,[19] and the OTS has not incurred any losses that are compensable under Financial's stipulation to maintain the Association's capital.[20]

## The Bankruptcy Case

Financial filed its Chapter 11 petition on July 1, 1994, approximately 1½ years after the Association was placed into receivership. Financial continues to manage the affairs of the bankruptcy estate as a debtor-in-possession.[21]

The OTS filed an unsecured proof of claim for $4,073,000 on December 12, 1994, based on Financial's net worth maintenance stipulation to the FSLIC/Association. In its proof of claim, the OTS recites that the priority of its claim is controlled by "11 U.S.C. § 365(o) or 11 U.S.C. § 507(a)(8) [now § 507(a)(9)], as appropriate."[22] Financial objected to the OTS's proof of claim on January 17, 1995.

At a pretrial conference on August 10, 1995, the OTS announced its intention to request that Financial cure the deficit allegedly created by the net worth maintenance stipulation and that the bankruptcy case be dismissed. The parties were instructed to prepare a Pretrial Order that included Financial's responses to the OTS's anticipated motion. The OTS filed its motion to cure and to dismiss that same day, August 10, 1995.

The Partial Pretrial Order filed December 14, 1995, consolidates for decision the allowance of the OTS's proof of claim and the merits of OTS's motion to cure the deficit under the net worth maintenance stipulation or to dismiss the case under 11 U.S.C. § 1112(b)(2). Also for decision are Financial's affirmative defenses to the OTS's motion to cure or dismiss and the OTS's motion to strike and/or dismiss those defenses. The issues the OTS briefed on the later motion duplicate those created by its proof of claim.

Financial's amended bankruptcy schedule shows that it had total assets of $227,651.06 as of June 30, 1991.[23] Financial's Monthly Financial Report of August 31, 1995, shows total cash assets of $153,184.14. In addition, the RTC holds tax refunds of $197,280.00 in trust.[24] If Financial were to cure the Association's risk-based capital deficit of $4,073,000, no funds to pay administrative claims against the estate would remain.

## History of Stipulations

In *Capital Punishment: The Death of Limited Liability for Shareholders of Federally Regulated Financial Institutions*,[25] the

substantially insufficient capital, or otherwise, in that OPSL was failing its core and risk-based capital requirements by significant margins, had failed to comply with the terms of a Capital Directive issued December 16, 1991 and was unable to generate sufficient internal earnings to achieve capital compliance; and
 b. OPSL's failure to maintain capital at or above the minimum level required by the Capital Directive was an unsafe or unsound practice that was likely to weaken the condition of OPSL or otherwise seriously prejudice the interests of its depositors.

**16.** Partial Pretrial Order filed December 14, 1995, Stipulation No. 13, at 6.

**17.** Partial Pretrial Order filed December 14, 1995, Stipulation No. 14, at 6.

**18.** Partial Pretrial Order filed December 14, 1995, Stipulation No. 15, at 6.

**19.** Partial Pretrial Order filed December 14, 1995, Stipulation No. 8, at 4.

**20.** Partial Pretrial Order filed December 14, 1995, Stipulation No. 24, at 7.

**21.** Partial Pretrial Order filed December 14, 1995, Stipulation No. 16, at 6.

**22.** Proof of Claim No. 1 filed December 12, 1994.

**23.** Partial Pretrial Order filed December 14, 1995, Stipulation No. 20, at 7.

**24.** Partial Pretrial Order filed December 14, 1995, Stipulation No. 21, at 7.

**25.** John C. Deal, Bob F. Thompson, and Bennett L. Ross, *Capital Punishment: The Death of Limited Liability for Shareholders of Federally Regulat-*

authors provide a history of net worth maintenance undertakings. They divide these undertakings into two categories: informal net worth maintenance stipulations and formal net worth maintenance agreements.

Informal net worth maintenance stipulations grew out of dividend restrictions imposed by the FSLIC when a holding company acquired an insured subsidiary. Beginning in 1969, the FSLIC directed insured thrift subsidiaries not to reduce net worth below certain levels by paying dividends. In 1973, the FHLBB, as administrative head of the FSLIC, began reviewing the net worth adequacy of acquired associations on an individual basis. In June of that year, the FHLBB notified savings institutions that they could modify dividend restrictions. The allowable modifications permitted subsidiaries to pay dividends if their holding companies would stipulate to the FSLIC that they would maintain the net worth of their subsidiaries at levels required by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts and, if needed, infuse sufficient additional capital to comply with the regulations. The FHLBB adopted regulations affirming this policy in 1976.[26]

As early as 1977, the FHLBB began requiring holding companies to provide informal net worth stipulations, not as an alternative to dividend restrictions, but as a condition to approving applications to acquire undercapitalized thrift institutions. To speed approval of the acquisition process, the FHLBB delegated authority to supervisory agents at regional Federal Home Loan Banks to process applications. The FHLBB required those supervisory agents to obtain informal net worth stipulations similar to those that displaced dividend restrictions. These informal stipulations were signed by an officer of the holding company and recited the language in the delegated authority regulation. Sometimes supervisory agents accepted holding company resolutions containing similar recitations. The informal stipulations were unlimited in duration and in the amount of capital required to be injected. The FHLBB's regulations and policy statements did not hint that the informal net worth stipulations were enforceable either in civil actions as contracts or administratively as written agreements. And the stipulations themselves contained no provisions addressing their enforceability.

In 1984, in response to a spate of applications to acquire new savings institutions, the FHLBB began using formal net worth maintenance agreements. The Board issued new regulations covering the formal net worth maintenance agreements. The regulations applied to shareholders of 25 percent or more of a new institution, required formal written agreements, described with specificity the extent of the signer's liability, and stated the effect of failure to comply with the agreement. The formal written agreements themselves, which applied to individuals as well as holding companies, limited the shareholder's duty to maintain the institution's net worth to a period of at least five years after the FSLIC granted insurance. And the agreements stated that they were enforceable by a cease-and-desist order. The FHLBB also developed formal net worth maintenance agreements for use by supervisory agents. These agreements also stated specifically that they were enforceable through cease-and-desist authority.[27]

### Financial's Informal Net Worth Maintenance Stipulation

█ The FHLBB's Resolution No. 79–143 and the stipulation it required constitute an informal net worth stipulation. Financial

ed *Financial Institutions*, 24 Cap.U.L.Rev. 67, 85–93 (1995).

26. 41 Fed.Reg. 48,728, 48,729 (1976).

27. In John C. Deal, Bob F. Thompson, and Bennett L. Ross, *Capital Punishment: The Death of Limited Liability for Shareholders of Federally Regulated Financial Institutions*, 24 Cap.U.L.Rev. 67, 93 (1995), the authors go on to detail changes

in net worth maintenance agreements developed after a 1988 FHLBB policy statement entitled "Regulatory Capital Maintenance Obligations of Acquirors of Insured Institutions" and after the passage of FIRREA which gave birth to the OTS. *See also* Howell E. Jackson, *The Expanding Obligations of Financial Holding Companies*, 107 Harv.L.Rev. 507, 517–27 (1994).

gave the stipulation in 1979 when informal net worth stipulations were first in vogue and before the Board required formal net worth maintenance agreements in 1984. The stipulation simply mirrors the conditions set forth in the resolution. It is labeled a "stipulation," and while it is signed by the president of Financial, it is not in the form of a corporate resolution. While the stipulation refers to compliance with the regulations, maintenance of capital levels, and the infusion of capital, it is otherwise open-ended. It contains no limit on its duration and no limit on the amount of capital required to be infused. The form of the stipulation is not that of an agreement and it contains no statement that it is enforceable administratively by a cease-and-desist order like the formal net worth agreements the FHLBB developed after 1984.

Such a stipulation was considered by the United States District Court for the Eastern District of Arkansas in *Federal Savings and Loan Insurance Corp. v. Savers, Inc.*[28] The Court found that the stipulation lacked the requisites of an enforceable contract. The holding company, Savers, Inc., had acquired Savers Federal Savings and Loan Association. As a condition to approval of the acquisition, the FHLBB sought and received a resolution and commitment letter from Savers, Inc., stating that it would maintain Savers Federal's net worth at a level consistent with 12 C.F.R. § 563.13(b)(1). After Savers Federal became insolvent and the FSLIC was appointed its conservator, the FSLIC sued Savers, Inc., on the stipulation for $443,000 in damages and specific performance. Suing in its capacity as conservator of the association, the FSLIC contended that it was a third-party beneficiary of a contract between the FHLBB and the association's holding company. The court denied the FSLIC relief, holding that the association was not a third-party beneficiary of a contract under Arkansas law and that the FSLIC held no private right of action. The court clarified its no-contract ruling by stating that what the FSLIC termed a contract

was no more than a legal requirement under federal regulations; that a "contract" to do what one is already required by law to do is really no contract at all; and that the commitment of Savers, Inc., to obey the law was not a "bargained for" consideration.

The United States District Court for the Western District of Texas addressed an informal net worth maintenance stipulation in *Resolution Trust Corp. v. Tetco, Inc.*[29] This was also a suit by a conservator against an association's holding company. Tetco, Inc., had acquired control of Bexar Savings Association and applied to the FSLIC for deposit insurance. As administrative head of the FSLIC, the FHLBB required Tetco, Inc., to register as a savings and loan holding company. The Board then conditioned issuance of deposit insurance on Tetco's stipulation "to cause Bexar's net worth to be maintained at minimum regulatory levels, and to infuse equity capital as necessary to comply with this net worth maintenance requirement."[30] Tetco's CEO provided a letter to the supervisory agent, affirming that Tetco would maintain net worth at the required level for so long as it controlled Bexar. After Bexar became insolvent, the FSLIC became its conservator. When the RTC succeeded the FSLIC, the RTC sued Tetco, seeking contract damages for breach of an alleged net worth maintenance agreement. The district court held that the net worth maintenance stipulation was not a condition of a contract and that the RTC held "no private right of action" to enforce regulatory conditions.

Finally, in *Federal Deposit Insurance Corp. v. Butler (In re Conner Corp.)*,[31] the United States Bankruptcy Court for the Eastern District of North Carolina considered an informal net worth maintenance stipulation. Connor Corporation had acquired Sun Savings and Loan Association in June 1984. At some point, Sun Savings converted from a thrift to a savings bank and became known as Cardinal Savings Bank, Inc. Cardinal applied to the FSLIC for deposit insurance. As administrative head of the FSLIC,

---

**28.** 1989 WL 248120 (E.D.Ark. Dec. 13, 1989).

**29.** 758 F.Supp. 1159 (W.D.Tex.1990).

**30.** *Id.* at 1161.

**31.** 127 B.R. 775 (E.D.N.C.1991).

the FHLBB conditionally approved the insurance application by resolution in January 1986. An approval condition in the resolution required Conner to increase and maintain the net worth of Cardinal "at an amount equal to the greater of five percent of total liabilities ... or the amount required by 563.13(b) of the Insurance Regulations...."[32] Conner complied with the resolution by furnishing a letter to the Bank Board agreeing to the condition, and the Board granted the insurance. Cardinal became insolvent, and the FSLIC became its conservator. When Conner filed bankruptcy in July 1987, the FDIC (the banking regulator at the time) filed an unsecured proof of claim based on an alleged contract arising from Cardinal's compliance with the FHLBB resolution. After FIRREA put the RTC into the shoes of the FDIC, the RTC sought allowance of the proof of claim. The bankruptcy judge found the stipulation was not an enforceable contract and disallowed the claim. On appeal, the district court affirmed. The district court did acknowledge, however, that the Bank Board could contract while acting in its regulatory capacity and cited cases where extensive negotiation had affirmed that principle. But, noting similarities to the *Tetco* decision, the court ruled that the terms of the agreement were defined by the regulations, rather than the give-and-take of negotiation; that there was no manifestation of intent to contract; that Conner's intent was only to comply with the regulations; and that no contract was bargained for and none existed.[33]

These three decisions conclude that informal net worth stipulations are not enforceable contracts. Two of the decisions reject the idea that thrift regulators hold a private right of action for money damages arising from federal regulatory statutes. One case,

*Federal Deposit Insurance Corp. v. Butler (In re Conner Corp.),*[34] acknowledges that formal net worth agreements may be enforceable contracts where the parties have manifested an intention to contract. But all the cases hold that informal net worth maintenance stipulations do not reflect a meeting of the minds arrived at by negotiation nor do they reflect an intention to contract. Such stipulations are not enforceable contracts; they are merely part of the process of applying for deposit insurance, registering as a holding company, or purchasing a banking or savings institution.

■ Financial's stipulation is an informal net worth stipulation that is not an enforceable contractual obligation. Rather, it merely acknowledges the existence of certain federal regulations with which holding companies are obligated to comply. It follows that if Financial's informal stipulation is not an enforceable contract, *a fortiori,* it is not an enforceable executory contract.[35] And arguably, if § 365(*o*) only applies to enforceable contracts, it does not apply to Financial's non-contractual stipulation. The OTS counters this syllogism by arguing that § 365(*o*) creates in Financial some new non-contractual liability. According to the OTS, § 365(*o*) changes a non-contractual stipulation into an enforceable commitment. Under this theory, § 365(*o*) creates a new cause of action whenever a stipulation is present at the filing of a Chapter 11 case. Accordingly, this new liability would attach without an underlying enforceable contract claim upon which § 365(*o*) could operate. To support this theory, the OTS relies on the 1992 Fourth Circuit Court of Appeals decision, *Resolution Trust Corp. v. In re First Corp, Inc. (In re Firstcorp, Inc.),* 973 F.2d 243.[36]

---

**32.** *Id.* at 776.

**33.** The court also addressed the effect of the Crime Control Act of 1990, stating, "The Crime Control Act of 1990 does not purport retroactively to create contract rights where none existed before." 127 B.R. 775, 780 (E.D.N.C.1991).

**34.** 127 B.R. 775 (E.D.N.C.1991).

**35.** Professor Vern Countryman defines an executory contract as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L.Rev. 439, 460 (1973); Part II, 58 Minn.L.Rev. 479 (1974).

**36.** 973 F.2d 243 (4th Cir.1992).

## Firstcorp

Firstcorp, Incorporated, was a North Carolina savings and loan holding company with two federally insured thrift subsidiaries: First Federal Savings and Loan Association of Raleigh ("Raleigh") and First Federal Savings and Loan Association of Durham ("Durham"). Firstcorp had acquired Raleigh in 1985, had issued $15,500,000 of debentures to raise capital for Raleigh, and had used part of the debenture proceeds to make a $13,400,000 loan to Raleigh in return for a capital note.[37]

When Firstcorp acquired Raleigh, the FHLBB had conditionally approved the acquisition by Resolution No. 85–219 dated March 29, 1985. One of the conditions of approval was that as long as Firstcorp controlled Raleigh, it would maintain Raleigh's net worth and infuse capital as needed:

> That, on the date that the proposed acquisition is consummated and at each calendar quarter thereafter for as long as Firstcorp controls [FF–Raleigh] the regulatory net worth of [FF–Raleigh] shall be maintained at the *greater of*: (1) three percent of total liabilities . . . , or (2) a level consistent with that required by Section 563.13(b) of the Rules and Regulations for Insurance Accounts . . . , as now or hereafter in effect, and where necessary, to infuse sufficient additional equity capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement.[38]

In January 1990, operating losses from non-performing real estate loans caused Raleigh's capital to fall below regulatory requirements. By this time, Congress had passed FIRREA, which replaced the FHLBB with the Office of Thrift Supervision ("OTS") as the thrift industry regulator. Firstcorp requested that the OTS grant it temporary relief from making a capital contribution, but the OTS rejected the overture and proceeded on several occasions to direct in writing that Firstcorp infuse capital into Raleigh.

Raleigh and the OTS negotiated a "Consent Agreement" on November 30, 1990, that acknowledged Raleigh's insufficient capital as grounds for the appointment of a conservator or receiver. Although Firstcorp was apparently not a party to the consent agreement, the agreement contained a provision stating: "[n]othing in this Agreement, . . . shall serve to preclude Firstcorp . . . from honoring its net worth maintenance obligations pursuant to FHLBB Resolution 85–219, and [FF–Raleigh's] receiving the benefit of such obligations." [39]

Contemporaneously, the OTS served Firstcorp with a "Notice of Charges and Hearing" and a "Temporary Order to Cease and Desist." The Notice charged Firstcorp with "an 'unsafe or unsound practice' by failing to fulfill its obligation to maintain the capital of FF–Raleigh." [40] The Temporary Order to Cease and Desist directed Firstcorp, *inter alia*, to extinguish Raleigh's capital note and transfer Firstcorp's ownership interest in Durham to Raleigh as partial satisfaction of its capital maintenance obligation.

After first filing a federal court action to enjoin the OTS from enforcing its cease and desist order, Firstcorp filed a Chapter 11 petition on December 5, 1990. Two days later, on December 7, the OTS appointed the RTC as receiver for Raleigh, and the RTC caused the assets of Raleigh to be transferred to a new institution for which it became conservator.

Using § 365(*o*), the OTS and the RTC requested that the bankruptcy judge compel Firstcorp "to assume its commitment under FHLBB Resolution No. 85–219 and to immediately cure the deficiency in the capital maintenance obligation existing as of the date of the bankruptcy filing." [41] The bankruptcy judge held for Firstcorp, however. He reasoned that since the terms of the commitment required compliance only "for as long as Firstcorp controls Raleigh," Firstcorp's obligation expired of its own terms

---

**37.** *In re Firstcorp, Inc.,* 126 B.R. 688, 689 (Bankr.E.D.N.C.1991).

**38.** 973 F.2d at 244.

**39.** 973 F.2d at 245.

**40.** *Id.* at 245.

**41.** *Id.* at 246.

when the OTS placed Raleigh into receivership.[42] On appeal the district court reversed, refusing to give effect to the control language relied upon by the bankruptcy judge.[43]

The Fourth Circuit Court of Appeals affirmed the district court, holding that § 365(o) became operative when the bankruptcy petition was filed on December 5, 1990; that Firstcorp's subsequent loss of control over Raleigh, occasioned by the OTS initiating the receivership on December 7, was immaterial; and that the OTS's appointment of the RTC as receiver for Raleigh after Firstcorp filed its bankruptcy petition was not an agency act of termination under the last sentence of § 365(o).

The *Firstcorp* decision leaps to the conclusion that if a debtor does not cure a capital maintenance deficiency, the debtor is no longer eligible for Chapter 11 relief; it over-expansively interprets the legislative history of § 365(o); and it finds a capital maintenance obligation without explaining the obligation's legal basis. In the first paragraph of the opinion, the decision says, "For the reasons that follow, we hold that the appellant holding company had undertaken a *capital maintenance obligation* in this case and that it was required under 11 U.S.C. § 365(o) to cure any deficit in that obligation before it could reorganize under Chapter 11."[44] The decision goes on to use the phrase "capital maintenance obligation" repeatedly without indicating the legal source of the obligation. Does the obligation spring from a contract, from an administrative order, or from § 365(o) itself?

The OTS contends that the condition in the resolution is unquestionably a commitment; ergo, § 365(o) requires cure of the deficit. Surely the condition in the resolution does not become an "obligation" just because of § 365(o) of the Bankruptcy Code. This would be unusual law. Ordinarily, substantive law outside the Bankruptcy Code, not a provision within a remedial law such as the Bankruptcy Code, determines liability. For example,

§ 502(b)(1) of the Code directs that non-bankruptcy law shall be used to determine liability upon which the allowance of claims depends. Bankruptcy judges refer constantly to non-bankruptcy federal or state law to determine the substantive rights of interested parties. One of the best known cases in the bankruptcy field, *Butner v. United States,* directs that state substantive law provides the rule of decision for determining property rights in bankruptcy litigation.[45]

The *Firstcorp* decision adds confusion by suggesting that the "obligation" arises from non-bankruptcy law, albeit not contractual law, i.e., from the condition in the FHLBB resolution:

> A capital maintenance imposed as a condition of FHLBB's approval of an acquisition, however, is clearly enforceable by OTS under settled law. *See Kaneb Servs., Inc. v. Federal Savings & Loan Ins. Corp.,* 650 F.2d 78 (5th Cir.1981).[46]

The citation to *Kaneb Servs., Inc. v. Federal Savings & Loan Ins. Corp.* implies that the court may have thought the OTS's administrative action created the obligation. The OTS had, after all, issued a cease and desist Order under 12 U.S.C. § 1818(c) that directed the holding company to cancel the note and transfer ownership of Durham to Raleigh. But even though the OTS can correct certain regulatory violations by cease and desist order, the *Kaneb* case is not authority for the proposition that it can collect a capital commitment with a cease and desist order.

In *Kaneb,* a holding company petitioned under the National Housing Act to review and modify an administrative order of the FSLIC. As a condition to approval of the acquisition of two insured institutions by the holding company, the FSLIC restricted annual dividend payouts to 50 percent of the net income. The holding company did not seek review of the conditional approval order, which it could have done within 30 days. Rather, it accepted the benefits of the order. Then, after completing the acquisitions, the

---

42. *Id.*

43. 1991 WL 355141 (E.D.N.C. Nov. 7, 1991).

44. 973 F.2d at 244 (italics added).

45. 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

46. 973 F.2d 243, 250 n. 6 (4th Cir.1992).

holding company petitioned for review and modification of the FSLIC's dividend order. The court denied the petition on the ground that the petitioner was estopped from challenging the order and ruled that the FSLIC acted within its powers in making the dividend restriction order. But the *Kaneb* decision only ruled that an administrative order denying the distribution of dividends was enforceable. It did not rule that the FSLIC could collect on a net worth maintenance stipulation with such an order.

The statutes governing the regulators themselves also limit the reach of administrative orders. Under 12 U.S.C. § 1818(b)(6), the OTS cannot enforce an administrative order against an institution-affiliated party to collect restitution, reimbursement, indemnification, or guarantee against loss without first showing that the institution was unjustly enriched or had recklessly disregarded the law:

**(6) Affirmative action to correct conditions resulting from violations or practices.** The authority to issue an order under this subsection and subsection (c) of this section which requires an insured depository institution or any institution-affiliated party to take affirmative action to correct or remedy any conditions resulting from any violation or practice with respect to which such order is issued includes the authority to require such depository institution or such party to—

(A) make restitution or provide reimbursement, indemnification, or guarantee against loss if—

(i) such depository institution or such party was unjustly enriched in connection with such violation or practice; or

(ii) the violation or practice involved a reckless disregard for the law or any applicable regulations or prior order of the appropriate Federal banking agency . . . .[47]

The Cease and Desist Order in *Firstcorp* was issued under 12 U.S.C. § 1818(c), which incorporates the requirements of § 1818(b)(6) set out above. Nevertheless, the *Firstcorp* opinion fails to discuss whether the holding company had been unjustly enriched or had recklessly disregarded the law or the regulations.

The foregoing statutes have been judicially scrutinized in *Wachtel v. OTS*[48] in the context of an attempt to enforce an administrative order to collect on a net worth maintenance stipulation. *Wachtel* involved a petition to review a condition the OTS imposed in writing that required petitioners to maintain the net worth of a savings bank subsidiary. The OTS filed a notice of charges under its cease and desist authority seeking payment of the net worth stipulation. The court held that the net worth stipulation was a guarantee and that the OTS could not recover on it monetarily without showing unjust enrichment or reckless disregard under 12 U.S.C. §§ 1818(b)(1) and 1818(b)(6)(A).[49]

Although it did not say so specifically, perhaps the court in Firstcorp believed the capital maintenance obligation arose because the resolution created a formal net worth agreement—an enforceable contract. The FHLBB did issue the conditional resolution in 1985, the year after the FHLBB first began using formal net worth maintenance agreements.[50] While the holding company did not give a stipulation conforming to the resolution's condition, it did acknowledge the condition in a letter seeking forbearance. Like formal agreements, the condition contained a five-year limitation and referred to federal law requiring 25 percent shareholders to enter agreements to maintain net worth. According to the foregoing historical material, these types of provisions were typical of formal net worth agreements used after 1984. But the Circuit Court does not explain whether it concluded that the condition in the resolution was a formal net worth maintenance agreement like those described in the history above. If the resolution were indeed an enforceable contract, certainly it

---

47. 12 U.S.C. § 1818(b)(6).

48. 982 F.2d 581 (D.C.Cir.1993).

49. Furthermore, *Federal Sav. and Loan Ins. Corp. v. Capozzi*, 855 F.2d 1319 (8th Cir.1988), holds that no private right of action arises under 12 C.F.R. § 563.13.

50. *See supra* History of Stipulations.

would come within the ambit of a commitment upon which § 365(*o*) would operate. Had the Fourth Circuit found that the conditional resolution was an enforceable contract, I could not quarrel with its decision. But, so far as I can determine, the Fourth Circuit did not so find.

▇ Contrary to Firstcorp's interpretation of the legislative history to § 365(*o*), I find little reason to conclude that Congress intended to create a substantive liability when it enacted § 365(*o*). The legislative history of § 365(*o*) fails to state that Congress intended to create a substantive liability in the Bankruptcy Code, an otherwise procedural law. Rather, that history can be read to support the idea that the new subsection only prevents a trustee from rejecting any commitment that is an enforceable executory contract. House Report No. 101–681(I) says the changes were "to prevent institution-affiliated parties from using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution *or evade other banking-related liabilities.*" [51] The use of the word "other" in the italicized language suggests that its antecedent—"capital reserve requirements of a Federally insured depository institution"—is a "banking—related liability" that exists under non-bankruptcy law, a liability in existence before any bankruptcy case is filed. Referring specifically to § 365(*o*), the history states: "The effect of this provision is to prevent the trustee from rejecting any such commitment as an *executory contract* under his usual avoidance powers." [52] While this statement indicates an intention to do away with the "rejection" of executory contracts where such commitments are concerned, it does not dispense with "executory contracts" as the non-bankruptcy law obligations that the new statute must operate on. That the new statute continues to operate on executory contracts finds further support in its re-

tention of the concept of assumption, which is peculiar to executory contracts under the Code.

Although the OTS argues that § 365(*o*) itself creates the liability, I cannot accept this theory. The new subsection certainly uses the words "any commitment," as the subject of its directive, and of course the stipulation in this case, although not an enforceable contract, is fairly characterized as a "commitment." But the legislative history does not prove that by dispensing with court approval of assumption and denying the remedy of rejection, Congress intended § 365(*o*) to jettison the need to find an *enforceable executory contract.* The subsection itself, which still appears under the executory contract section of the Code, contains nothing to indicate that it will operate on any obligation that is not embodied within such an enforceable contract. It only applies, like the other subdivisions of § 365, to executory contracts and unexpired leases in existence on the date the bankruptcy petition is filed. If an enforceable contract obligation to maintain the net worth of an insured financial institution exists on that date, and if that enforceable contract obligation is executory, then § 365(*o*) commands the trustee to consider the contract assumed and to cure any existing deficit thereunder, just as he must with other executory contracts or unexpired leases assumed under § 365 in general. But if there is no enforceable contract or such a contract has become non-executory before the petition is filed, subsection 365(*o*) does not operate on that contract.[53]

In this case, the commitment is an informal net worth maintenance stipulation that is not an enforceable contract under applicable non-bankruptcy law. Since the stipulation was not such a contract before the petition was filed, subsection § 365(*o*) does not oper-

---

51. H.R. 101–681(I), 101st Cong. § 2123 (1990).

52. H.R. 101–681(I), 101st Cong. § 2123(b) (1990). The term "avoidance power" as used here is not technically accurate. Examples of bankruptcy avoidance powers are the trustee's ability to reverse a prepetition transaction by a preference action or a fraudulent transfer action. Rejecting an executory contract is not an avoid-

ance in the same sense. Under § 365(g), rejection of an executory contract is merely a breach of the contract for which remedies remain.

53. Under Countryman's definition of an executory contract, there is considerable doubt whether the stipulation in this case can be considered executory. *See supra* n. 35.

ate upon it. The motions of the OTS are denied.

The foregoing discussion shall constitute findings of fact and conclusions of law under Fed.R.Bankr.P. 7052 and Fed.R.Civ.P. 52(a). A judgment reflecting this ruling shall be entered on a separate document in compliance with Fed.R.Bankr.P. 9021 and Fed. R.Civ.P. 58.

IT IS SO ORDERED.

APPENDIX A

FEDERAL HOME LOAN BANK BOARD

No. 79–143

Date: February 21, 1979

WHEREAS, Overland Park Financial Corporation ("Financial"), Kansas City, Missouri, has applied to the Federal Savings and Loan Insurance Corporation ("Corporation"), pursuant to Section 408g(e) and 408(g) of the National Housing Act ("Act") and Sections 584.4 and 584.6 of the Regulations for Savings and Loan Holding Companies, for prior written approval to acquire control of Overland Park Savings and Loan Association, ("Association"), Overland Park, Kansas, and to borrow $1,600,000 from Commerce Bank of Kansas City, Kansas City, Missouri, for the purpose of acquiring all of the outstanding capital stock of said association; and

WHEREAS, the Federal Home Loan Bank Board ("Bank Board") as operating head of the Corporation, after considering the information in these applications and in other available sources of relevant information, has determined that the proposed transactions comport with requirements for approval set out in Sections 408(e) and 408(g) of said Act, provided the conditions hereinafter set forth are complied with:

NOW, THEREFORE, IT IS HEREBY RESOLVED, that the aforementioned applications are hereby approved, provided that the following conditions are complied with in a manner satisfactory to the Board's Supervisory Agent at the Federal Home Loan Bank of Topeka:

1. The proposed acquisition shall be consummated not later than 120 days after the date of this Resolution;

2. Financial shall file with the Supervisory Agent an affidavit certifying that the acquisition was consummated in accordance with the provisions of the application and this Resolution and stating the exact number of shares of the stock of the Association that were required;

3. The President or Vice President of Financial shall certify to the Supervisory Agent, no earlier than ten days prior to consummation of the acquisition, that no material adverse change in the financial condition of Financial or the Association has occurred since submission of the applications referred to herein;

4. Financial shall stipulate to the Corporation that it (Financial) will cause the net worth of the Association to be maintained at a level consistent with that required by Section 583.13(b) of the Rules and Regulations for Insurance of Accounts ("Regulations"), as now or hereafter in effect, and where necessary, that it will infuse sufficient additional equity capital to effect compliance with such requirement in a form satisfactory to the Corporation;