In re OVERLAND PARK FINANCIAL CORPORATION, Debtor.

Office of Thrift Supervision, Appellant,

v.

Overland Park Financial Corporation, Appellee.

Bankruptcy No. 94–21190–11.
Civ. No. 98–2061–KHV.

United States District Court,
D. Kansas,
Kansas City Division.

March 31, 1999.

Benjamin F. Mann, Kathryn B. Bussing, Blackwell, Sanders Matheny, Weary & Lombardi, L.C., Kansas City, MO, for Debtor.

Martin Jefferson Davis, Teresa A. Scott, Washington, DC, Joann E. Corpstein, Overland Park, KS, for Office of Thrift Supervision.

Robert D. Lantz, Steven M. Leigh, Cynthia C. Dunham, Ferry F. Laws, III, Martin, Leigh & Laws, P.C., Erlene W. Krigel, Krigel & Krigel, P.C., Kansas City, MO, for Resolution Trust Corporation and its Statutory Successor, Federal Deposit Insurance Corporation.

**Memorandum And Order**

VRATIL, District Judge.

This appeal is from the final judgment of the United States Bankruptcy Court for the District of Kansas entered in *In re*

*Overland Park Financial Corporation,* 217 B.R. 879 (Bankr.D.Kan.1998). The Office of Thrift Supervision ("OTS") appeals the bankruptcy court's holding that a net worth maintenance stipulation which Overland Park Financial Corporation ("Financial") made in connection with its acquisition of Overland Park Savings & Loan Association ("OPSL") is not an enforceable contract, and therefore is not a capital maintenance commitment subject to 11 U.S.C. § 365(*o*). In lieu of an order reversing and remanding to the bankruptcy court, OTS seeks a judgment from this Court which allows the OTS capital maintenance claim, requires Financial to cure as much of the deficit under its capital maintenance commitment as possible, and orders dismissal of the case.

For reasons stated below, the order of the bankruptcy court is reversed and remanded.

## Standard of Review

■ Under 28 U.S.C. § 158(a), district courts have jurisdiction to hear appeals from final judgments, orders and decrees of bankruptcy courts. In reviewing the decision of a bankruptcy court pursuant to Section 158(a), the district court applies the same standards of review that govern appellate review in other cases. *See, e.g., Sender v. Johnson (In re Hedged–Investments Assocs., Inc.),* 84 F.3d 1267, 1268 (10th Cir.1996). The Court therefore reviews the bankruptcy court's legal determinations de novo and its factual findings for clear error. *See id.*

## Facts

Overland Park Financial Corporation ("Financial") incorporated in 1978 for the purpose of acquiring Overland Park Savings & Loan Corporation ("OPSL"), a Kansas thrift institution. Because the Federal Savings and Loan Insurance Corporation ("FSLIC") insured OPSL's deposits at the time, Financial was required to obtain the FSLIC's approval of its proposed acquisition. In 1979 Financial applied to the FSLIC for approval to acquire OPSL. *See* 12 U.S.C. § 1730a(e)(1)(B) (repealed 1989).[1]

On February 21, 1979, the Federal Home Loan Bank Board ("FHLBB"), as operating head of the FSLIC, approved the proposed acquisition.[2] The approval was conditioned upon Financial's stipulation that it would maintain the net worth of OPSL.[3] To comply with that condition,

1. Under former 12 U.S.C. § 1730a(e), the FSLIC had a duty to consider the financial resources and future prospects of the institutions involved before approving an acquisition application. *See Kaneb Servs., Inc. v. Federal Sav. & Loan Ins. Corp.,* 650 F.2d 78, 82 and n. 12 (5th Cir.1981). *See also* 12 U.S.C. § 1730a(e)(1)(B) (repealed 1989) (acquisition of insured institution requires prior written approval of FSLIC; FSLIC shall approve acquisition of insured institution "unless it finds the financial and managerial resources ... of the company and institution involved to be such that the acquisition would be detrimental to the institution or the insurance risk" of FSLIC).

With the enactment of the Federal Institutions Reform, Recovery and Enforcement Act' of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (1989), Congress repealed § 1730a and codified a new provision governing the regulation of thrift holding companies. *See* 12 U.S.C. § 1467a.

2. The National Housing Act, Pub.L. No. 73–479, 48 Stat. 1246 (1934), created the FSLIC

"with responsibility to insure thrift deposits and regulate all federally insured thrifts ... (codified, as amended, at 12 U.S.C. §§ 1701–1750g (1988 ed.))." *United States v. Winstar Corp.,* 518 U.S. 839, 844, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Until August 1989, the FHLBB directed and operated the FSLIC. *See* 12 U.S.C. § 1725(a) (repealed 1989).

FIRREA abolished the FSLIC and transferred its deposit insurance function to the Federal Deposit Insurance Corporation. *See* Pub.L. No. 101–73, §§ 401(a)(1), 211, 103 Stat. 183, 354, 218 (1989). FIRREA also abolished the FHLBB, created OTS, and transferred to OTS and its director the role of primary federal regulator of federally insured savings associations. *See* 12 U.S.C. §§ 1437, note 1462a, and 1463(a)(1).

3. The FHLBB resolution provided, in relevant part, that Financial's application was approved,

provided that the following conditions are complied with in a manner satisfactory to

on April 24, 1979, Financial stipulated in writing that it would

cause the net worth of [OPSL] to be maintained at a level consistent with that required by Section 563.13(b)[4] of the Rules and Regulations for Insurance of Accounts, as now or hereafter in effect, and where necessary, ... it will infuse sufficient additional equity capital to effect compliance with such requirement in a form satisfactory to [the FSLIC].

The stipulation was signed by Clarke L. Henry, president of Financial. Financial subsequently completed its acquisition of OPSL.

On June 8, 1990, OTS advised OPSL that a Report of Joint Examination revealed that OPSL would fail to meet its minimum capital requirements. Accordingly, OPSL sent a letter to Financial on September 13, 1990, asking Financial to provide a capital infusion pursuant to the capital maintenance stipulation. On November 5, 1990, Financial responded that it was "not prepared to make the requested capital contribution at that time" in light of the "current economic and regulatory environment" and the "prevailing sentiment of investors." Although Financial further stated that it "m[ight] consider making a capital contribution in the future," it has not made any capital infusion to date.

On December 16, 1991, OTS issued a Capital Directive which called for Financial to comply with the capital maintenance stipulation. The Directive required that by April 30, 1992, OPSL either (a) comply with its fully phased-in capital requirements and have a minimum core capital ratio of 4%, or (b) present to OTS a letter of intent providing for the acquisition of OPSL by a qualified prospective investor acceptable to OTS. OPSL and each of its directors consented to the Directive; Financial, however, did not honor the Directive.[5]

On September 28, 1992, Advanced Financial, Inc., sought preliminary clearance from the OTS Midwest Regional Office to pursue acquisition of OPSL. On November 3, 1992, OTS responded with an extensive request for additional information and stated that its Midwest Regional Office was unwilling to recommend that OTS accept a non-cash contribution of purchase mortgage servicing rights as capital.

On November 13, 1992, the director of OTS ("Director") appointed the Resolution

---

the Board's Supervisory Agent at the Federal Home Loan Bank of Topeka:

\* \* \*

4. [Financial] shall stipulate to [the FSLIC] that it [Financial] will cause the net worth of [OPSL] to be maintained at a level consistent with that required by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts ..., as now or hereafter in effect, and where necessary, that it will infuse sufficient additional equity capital to effect compliance with such requirement in a form satisfactory to the [FSLIC];

....

4. Section 563.13(b) established minimum annual net worth requirements for insured institutions. It required each insured institution to have a net worth equal to the greater of (1) the applicable Federal insurance reserve account requirement, plus other specified amounts, or (2) an amount determined under the provision's Asset Composition and Net Worth Index. It also required each insured

institution to have an additional amount of net worth capital equal to five percent of the unpaid principal amount of all outstanding borrowings. *See* 12 C.F.R. 563.13(b) (1979).

5. Title 12 U.S.C. § 1464 grants OTS the power to require savings associations to maintain adequate capital, using any methods OTS determines to be appropriate, *see* 12 U.S.C. § 1464(s)(1)(B), including the issuance of a capital directive:

the Director may issue a directive requiring any savings association which fails to maintain capital at or above the minimum level required by the Director to submit and adhere to a plan for increasing capital which is acceptable to the Director.... Any directive issued and plan approved ... shall be enforceable under [12 U.S.C. § 1818] to the same extent and in the same manner as an outstanding order which was issued under [12 U.S.C. § 1818] and has become final.

12 U.S.C. § 1464(s)(4).

Trust Corporation ("RTC") as receiver for OPSL. The Director based his appointment on his findings that

(a) [OPSL was] in an unsafe and unsound condition to transact business due to having substantially insufficient capital, ... had failed materially to comply with the terms of a Capital Directive issued December 16, 1991, and [was] unable to generate sufficient internal earnings to achieve capital compliance; and

(b) [OPSL's] failure to maintain capital at or above the minimum level required by the Capital Directive [was] an unsafe or unsound practice that [was] likely to weaken the condition of [OPSL] or otherwise seriously prejudice the interests of its depositors.

OTS Order No. 92–486 at 2. At the time of the receivership, OPSL was reporting a risk-based capital deficiency of at least $4,073,00.00, a core capital deficiency of at least $3,767,000.00, and a tangible capital deficiency of at least $567,000.00. OPSL did not challenge the receivership and has not transacted any business since that date.

OTS acknowledges that it incurred no losses that are compensable under Financial's stipulation to maintain OPSL's capital.

### Procedural Background

On July 1, 1994, twenty months after OTS placed OPSL into receivership, Financial filed a petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Since that date Financial has managed the property and affairs of the bankruptcy estate as a debtor-in-possession.

On December 12, 1994, OTS filed an unsecured proof of claim alleging Finan-

cial's breach of its capital maintenance stipulation and asserting its rights under 11 U.S.C. §§ 365(*o*) and 507(a)(8) [now § 507(a)(9)].[6] OTS sought $4,073,000.00 as an unsecured priority claim. On January 17, 1995, Financial filed its objection to OTS's proof of claim, and filed a proposed Plan of Reorganization and Proposed Disclosure Statement.

The proposed Plan of Reorganization and Proposed Disclosure Statement categorized OTS's claim as an impaired, Class 2, § 507(a)(8) [now § 507(a)(9)] priority claim. The Plan of Reorganization proposed a liquidation of the estate, with its assets to be distributed among the allowed claim. As of August 31, 1995, Financial's Monthly Financial Report showed that Financial had total cash assets in the amount of $153,184.14. In addition, the RTC holds in trust additional tax refunds in the amount of $197,280.00.

On August 11, 1995, OTS moved for an order requiring an immediate cure of the alleged deficit under the capital maintenance stipulation and dismissal of the case. The parties have stipulated that a determination requiring Financial to comply with Section 365(*o*)'s immediate cure requirement would exhaust the bankruptcy estate and make it impossible for Financial to effectuate a plan of reorganization.

The *Partial Pretrial Order* filed December 14, 1995 (Doc. #124 in *Overland Park*) sets forth Financial's affirmative defenses to the OTS motion. On February 9, 1996, OTS moved to strike and/or dismiss Financial's defenses. Both sides submitted briefs on the issue.

On February 5, 1998, the bankruptcy court entered judgment denying OTS's motion for immediate cure and disallowing its claim.[7]

---

**6.** 11 U.S.C. § 507(a)(9) provides:

    (a) The following expenses and claims have priority in the following order:

               * * *

    (9) Ninth, allowed unsecured claims based upon any commitment by the debtor to a Federal depository institutions regulatory

agency (or predecessor to such agency), to maintain the capital of an insured depository institution.

**7.** The Partial Pretrial Order which the bankruptcy court entered on December 14, 1995, consolidated for decision "the allowance of the OTS's proof of claim and the merits of

## The Bankruptcy Court's Memorandum Opinion[8]

The bankruptcy court began its analysis with a detailed discussion of the history of informal and formal net worth maintenance stipulations.[9] It concluded that Financial's stipulation is an informal net worth maintenance stipulation because it is open-ended and contains no limit on its duration and the amount of capital it requires to be infused; because it is not in the form of an agreement and contains no statement that it is enforceable administratively by a cease and desist order; because it simply mirrors the language of the FHLBB resolution; and because it is not in the form of a corporate resolution.

Citing case law which has interpreted similar net worth maintenance stipulations,[10] the bankruptcy court held that informal net worth maintenance stipulations are not enforceable contracts. Such stipulations, the court stated, "do not reflect a meeting of the minds arrived at by negotiation nor do they reflect an intention to contract," and "are merely part of the process of applying for deposit insurance, registering as a holding company, or purchasing a banking or savings institution." *Overland Park,* 217 B.R. at 886. Financial's stipulation, the court therefore opined, is not an enforceable contractual obligation, but rather, "merely acknowledges the existence of certain federal regulations with which holding companies are obligated to comply." [11] *Id.*

Subsection (*o*), like the other subsections of Section 365, the court held, only applies to "executory contracts and unexpired leases in existence on the date the bankruptcy petition is filed." 217 B.R. at 886. If Financial's informal stipulation "is not an enforceable contract," the court said, "a fortiori, it is not an enforceable executory contract.[12] And arguably, if § 365(*o*) only

OTS's motion to cure the deficit under the net worth maintenance stipulation or to dismiss the case under 11 U.S.C. § 1112(b)(2)." 217 B.R. at 883. In the view of this Court, however, the issue whether the debtor-in-possession has a duty to cure is entirely separate from the question whether the OTS proof of claim was properly allowed. The bankruptcy court's opinion focuses almost exclusively on matters which appear to this Court to relate only to the proof of claim issue and do not speak to the proper construction of Section 365(*o*) of the Bankruptcy Code.

8. *See Overland Park,* 217 B.R. 879.

9. The bankruptcy court noted that informal stipulations, which were signed by an officer of the holding company and recited the language of the pertinent regulation, contained no provisions addressing their enforceability. In 1984, however, the FHLBB began using formal stipulations. Unlike their predecessors, these formal agreements specifically stated that they were enforceable through the agency's cease and desist authority.

10. *E.g., Federal Savings and Loan Insurance Corp. v. Savers, Inc.,* 1989 WL 248120 (E.D.Ark. Dec. 13, 1989) (stipulation lacked requisites of enforceable contract); *Resolution Trust Corp. v. Tetco, Inc.,* 758 F.Supp. 1159 (W.D.Tex.1990) (stipulation not condition of contract; RTC held no "private right

of action" to enforce regulatory conditions) (subsequent history omitted); *Federal Deposit Insurance Corp. v. Butler (In re Conner Corp.),* 127 B.R. 775 (E.D.N.C.1991) (stipulation was not result of negotiation or bargaining and thus was not enforceable contract).

11. The bankruptcy court's finding that Financial's stipulation acknowledges the existence of "certain federal regulations with which *holding companies* are obligated to comply," 217 B.R. at 886 (emphasis added), appears to be in error. At the time Financial signed the stipulation, Section 563.13(b) actually required *insured institutions* to maintain adequate capital reserves as a cushion against losses. *See* 12 C.F.R. § 563.13(b) (1979). *See also, e.g., United States v. Winstar Corp.,* 518 U.S. 839, 845, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

12. In a footnote the bankruptcy court cited Professor Countryman's definition of an executory contract as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." 217 B.R. at 886 n. 35 (citing Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L.Rev. 439, 460 (1973); *Part II,* 58 Minn. L.Rev. 479 (1974)).

applies to enforceable contracts, it does not apply to [Financial's] non-contractual stipulation." *Id.* Accordingly, the court held that "[Financial's] net worth maintenance stipulation in this case is not an enforceable contract; therefore, it is not a capital maintenance commitment subject to § 365(*o*)." [13] *Id.* at 881.

The bankruptcy court rejected OTS's argument that Section 365(*o*) "changes a non-contractual stipulation into an enforceable commitment," thus creating "a new cause of action whenever a stipulation is present at the filing of a Chapter 11 case." *Id.* The court opined that "[s]urely the condition in the [FHLBB] resolution does not become an 'obligation' just because of § 365(*o*) of the Bankruptcy Code." *Id.* at 888. Ordinarily, the court noted, "substantive law outside the Bankruptcy Code, not a provision within a remedial law such as the Bankruptcy Code, determines liability." *Id.* "Bankruptcy judges refer constantly to non-bankruptcy federal or state law to determine the substantive rights of interested parties." *Id.* (citing *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)). *See also, e.g., Diamant v. Kasparian (In re: Southern California Plastics, Inc.)*, 165 F.3d 1243, 1247 (9th Cir.1998) (validity and legality of claims under procedure for allowance of claims determined by applicable non-bankruptcy law; "claim cannot be allowed if it is unenforceable under nonbankruptcy law") (citing, *e.g.*, 11 U.S.C. § 502(b)(1)).

The court also rejected the notion that OTS's cease and desist authority under 12 U.S.C. § 1818 provides the basis for an enforceable obligation. Under Section 1818(b)(6), the court noted, OTS cannot

enforce an administrative order to collect restitution or reimbursement absent a showing of unjust enrichment or reckless disregard of the law. *See* 217 B.R. at 889.

Accordingly, the bankruptcy court denied OTS's motion to cure Financial's deficit under the net worth maintenance stipulation and to dismiss the case under 11 U.S.C. § 1112(b)(2).

## Discussion

According to OTS, this appeal presents three issues: 1) whether the bankruptcy court erred in holding that Financial's stipulation is not a capital maintenance commitment subject to Section 365(*o*); 2) whether the court erred in denying OTS's motion pursuant to Section 365(*o*) for an order requiring an immediate cure of the deficit; and 3) whether the court erred in disallowing OTS's proof of claim. *See* OTS's *Statement Of Issues And Designation Of Record On Appeal* (Doc. # 241 filed in *Overland Park,* Case No. 94–21190).

## I. Section 365(*o*) Does Not Require An Enforceable Contract

OTS contends that the bankruptcy court erred in determining that Section 365(*o*) does not apply to Financial's capital maintenance stipulation. OTS argues that under Section 365(*o*) the trustee—or as here, the debtor-in-possession, *see* 11 U.S.C. § 1107(a)—may not decline to assume the obligation and cure a deficit thereunder; that the assumption and obligation to cure occur by operation of law, without review by, or approval of, the bankruptcy court; and finally, that the

---

**13.** The bankruptcy court summarized its holding as follows:

> If an enforceable contract obligation to maintain the net worth of an insured financial institution exists on [the date the bankruptcy petition is filed,] and if that enforceable contract obligation is executory, then § 365(*o*) commands the trustee to consider the contract assumed and to cure any existing deficit thereunder, just as he must with other executory contracts or unexpired

> leases assumed under § 365 in general. But if there is no enforceable contract or such a contract has become non-executory before the petition is filed, subsection 365(*o*) does not operate on that contract.

217 B.R. at 890. The court further noted that "[u]nder Countryman's definition of an executory contract, there is considerable doubt whether the stipulation in this case can be considered executory." *Id.* n. 53 (citing Countryman, *supra*).

obligation attaches immediately, i.e., without delay, at once. *See Resolution Trust Corp. v. First Corp., Inc. (In re First Corp, Inc.),* 973 F.2d 243, 247 (4th Cir. 1992).

OTS further contends that the phrase "any commitment" as used in Section 365(*o*) connotes "every" commitment, *e.g., Bollman Hat Co. v. Root,* 112 F.3d 113, 116 (3d Cir.) (words "any" and "all" in contract mean "every") (citing Black's Law Dictionary 74, 94 (6th ed.1990)), *cert. denied,* —— U.S. ——, 118 S.Ct. 373, 139 L.Ed.2d 290 (1997), and argues that Financial's stipulation constitutes a "commitment" within the meaning of Section 365(*o*). *See Overland Park,* 217 B.R. at 890 ("of course the stipulation in this case, although not an enforceable contract, is fairly characterized as a 'commitment.'").

According to OTS, the bankruptcy court needlessly delved into the legislative history of Section 365(*o*) in order to justify its conclusion that Section 365(*o*) only applies to enforceable executory contracts. OTS insists that the plain language of the provision is clear and unambiguous, and had Congress intended to limit the provision's applicability to contractual undertakings, it would have made that intent clear in the statute itself. *See, e.g., Burlington Northern R.R. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987) (unless exceptional circumstances dictate otherwise, judicial inquiry is complete when terms of statute are unambiguous); *Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 808 n. 3, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) (legislative history irrelevant to interpretation of unambiguous statute).

Neither the plain language of Section 365(*o*) nor its legislative history, OTS argues, support the conclusion that Section 365(*o*) provides for the immediate cure of deficits under capital commitments in enforceable contracts, but exempts from that requirement deficits under capital commitments in *other* forms. OTS argues that the occurrence of the phrase "any commitment" not only in Section 365(*o*), but also in Sections 507(a)(9) and 523(a)(12),[14] reveals that Congress's use of that language was intentional, and that it forecloses any limitation upon the types of capital maintenance commitments to which Section 365(*o*) applies. *E.g., Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (word "any" in statutory phrase "any business, transaction, or series of transactions" undercuts attempt to impose narrowing construction).

The bankruptcy court held that a capital maintenance commitment must take the form of an enforceable executory contract in order for Section 365(*o*) to operate upon such a commitment. *See* 217 B.R. at 889–90. It found such a requirement based on its interpretation of the section heading of Section 365 and the legislative history, its analysis of case law which holds that net worth stipulations are not enforceable contracts, and its rejection of the analysis in *Firstcorp.*

For reasons stated below, the Court concludes that the bankruptcy court erred in holding that Section 365(*o*) only applies to net worth maintenance commitments that are enforceable executory contracts. The plain language of Section 365(*o*) and its legislative history do not support such a requirement. Nor does the case law which the court cited clearly establish such a requirement.

■ Statutory interpretation must begin with the words of the statute. *See United States v. James,* 478 U.S. 597, 604, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986).

---

**14.** Under 11 U.S.C. § 523(a)(12), an individual debtor may not obtain discharge from any debt

for malicious or reckless failure to fulfill any commitment by the debtor to a Federal depository institutions regulatory agency to

maintain the capital of an insured depository institution, except that this paragraph shall not extend any such commitment which would otherwise be terminated due to any act of such agency; . . . .

When Financial filed its Chapter 11 petition, Section 365 provided in relevant part:

Executory contracts and unexpired leases

\* \* \*

(o) In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Director of the Office of Thrift Supervision, the Comptroller of the Currency, or the Board of Governors of the Federal Reserve System, or its predecessors or successors,[15] to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507. This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.

11 U.S.C. § 365 (Supp. II 1990). Subsection (o) does not use the word "executory," nor does it even refer to a "contract." Had Congress intended subsection (o) to apply only in the case of executory contracts, surely it would have said so. Indeed, Section 365 employs the word "executory" 17 times and the word "contract" 84 times. Nor does subsection (o) use the word "consideration" or refer to an "enforceable" commitment. The term "commitment," which is not defined in Section 365(o), is commonly defined simply as an agreement or pledge to do something. *See Firstcorp*, 973 F.2d at 249 n. 5 (citing Black's Law Dictionary 248 (5th ed.1979)). The only language in subsection (o) which

even remotely invokes contract principles is the reference to a claim for a "breach" of the obligations under such a commitment. But that language alone does not plainly require an enforceable contract.

The Fifth Circuit's opinion in *Groos Nat'l Bank v. Comptroller of the Currency*, 573 F.2d 889 (5th Cir.1978), is particularly instructive on this issue. Groos National Bank and Manges, its chief shareholder, had entered an agreement with the Comptroller of the Currency (OCC) to forestall cease and desist proceedings which the agency planned to bring against them pursuant to 12 U.S.C. § 1818. The agreement contained a restriction which severely limited loans or extensions of credit by the bank to its shareholders. When the OCC later discovered that Manges and Groos had violated the agreement, it initiated cease and desist proceedings.

Manges argued that the agreement was invalid because it lacked consideration, and therefore the OCC lacked authority to initiate cease and desist proceedings based on the alleged violation of the agreement. The Fifth Circuit rejected that argument. It held that the language of the statute says nothing of consideration. Moreover, it opined that there is no reason

to import the common law of consideration, proper to private contractual relations, into the relationships between a regulatory agency and the entity it regulates. The Comptroller is authorized by statute to exercise extensive controls upon banks; the statute clearly contemplates that agreements may occur between the Comptroller and banks; and if the Comptroller does enter such an agreement by way of attaining voluntary compliance, we will not introduce the trappings of common-law contractual consideration to question that agreement. To do so would deeply intrude upon the regulatory agency's legitimate

---

**15.** Congress subsequently amended Section 365(o) by replacing the reference to specific agencies with language which referred simply to "a Federal depository institutions regulatory agency (or predecessor to such agency)." Pub.L. No. 103–394, § 501(d)(10)(D), 108 Stat. 4106, 4145.

efforts to substitute voluntary agreement for formal cease and desist proceedings.

573 F.2d at 896.

To support its conclusion that Section 365(o) requires an enforceable contract, the bankruptcy court cited three cases which found that net worth stipulations like the one here are not enforceable contracts: *Savers,* 1989 WL 248120; *Tetco,* 758 F.Supp. 1159; and *Conner,* 127 B.R. 775. The Court finds those cases to be distinguishable from the present case.

In *Savers,* the FSLIC sued Savers, a holding company which had acquired Savers Federal Savings and Loan Association ("Savers Federal"). The FSLIC argued that the holding company's resolution and commitment letter—which indicated that the company would maintain the capital of Savers Federal at a level consisted with 12 C.F.R. § 563.13(b)(1)—constituted a contract between the FHLBB and the company. Arguing that Savers Federal was the third-party beneficiary of that contract, the FSLIC sought to enforce Savers Federal's rights as its conservator.

In a one page order dismissing the FSLIC complaint, the court held that the FSLIC, as conservator of Savers Federal, could not enforce a private right of action pursuant to Section 563.13. The court opined that "the FSLIC is here attempting to do indirectly what it cannot do directly" under Eighth Circuit precedent.[16] 1989 WL 248120, at *1. The court also rejected the FSLIC's alternative argument that it was bringing the action pursuant to state contract law, holding that "[w]hat the FSLIC terms a 'contract' is no more than a legal requirement under federal banking regulations." *Id.*

In *Tetco,* Tetco applied for federal deposit insurance for its acquisition of Bexar Savings Association. The FHLBB issued a resolution approving the application, subject to Tetco's promise to cause Bexar's net worth to be maintained at minimum regulatory levels and promise to infuse equity capital as necessary to comply. The FHLBB informed Tetco of the net worth condition, but failed to mention the capital infusion condition. Tetco's CFO then wrote a letter confirming that it would cause Bexar's net worth to be maintained at minimum regulatory levels. After Bexar became insolvent, the FSLIC took over as Bexar's conservator.

The RTC (the FSLIC's successor) then brought suit claiming Tetco's breach of the net worth maintenance agreement. The RTC argued that the sequence of events, and the resulting resolution and confirmation letter, constituted consideration giving rise to an enforceable obligation. The court found that the net worth condition in the FHLBB resolution was a statement setting forth a regulatory condition, and that the stipulation letter was merely an acknowledgment "to be bound by an order of the pertinent regulatory authorities," but concluded that no "meeting of the minds" occurred. Accordingly, the court held that no contract ensued. *See* 758 F.Supp. 1159.

Finally, in *Conner,* Conner Corporation acquired Cardinal Savings and Loan Association. Cardinal subsequently applied to the FHLBB for FSLIC insurance. The FHLBB granted conditional approval of Cardinal's application, subject to Cardinal's submission of an agreement to maintain its net worth in accordance with 12 C.F.R. § 536.13(b). Accordingly, Conner sent a letter to the FHLBB which stated that Conner agreed to infuse sufficient equity capital into Cardinal, in a form satisfactory to the agency, so as to maintain Cardinal's net worth at the amount required by Section 563.13(b). After Cardinal became insolvent, the FHLBB appointed the FSLIC as Cardinal's receiver. Cardinal then filed a proof of claim against Conner.

---

**16.** *See Federal Savings and Loan Ins. Corp. v. Capozzi,* 855 F.2d 1319 (8th Cir.), *vacated on other grounds,* 490 U.S. 1062, 109 S.Ct. 2058, 104 L.Ed.2d 624 (1989).

The bankruptcy court held that there was no contract between Conner and the FHLBB, and that if there was a contract, Cardinal had no basis no recover under the contract because under state law Cardinal was not a third party beneficiary. The FDIC (as successor to the FSLIC) appealed. The district court affirmed, holding that no contract existed between Conner and the FHLBB.

Those cases are distinguishable from the present situation. In each of those cases, the FSLIC, the RTC and the FDIC sued in their capacity as conservator or receiver, and stood in the shoes of their failed financial institutions. The failed financial institutions had no connection with the capital maintenance commitments except their ownership of the capital addressed in those commitments. Consequently, the only theory on which those institutions (and the regulatory agencies as conservator or receiver) could have sued to enforce the commitments was as asserted third party beneficiaries. Unlike those cases, OTS does not claim that Financial has any contractual obligation. Instead, it claims that Financial's stipulation is an enforceable liability under the plain language of Section 365(*o*), or alternatively, that OTS is empowered to enforce the obligation pursuant to its administrative authority under 12 U.S.C. § 1818(b)(1). *See also, e.g., Rapaport v. Office of Thrift Supervision,* 59 F.3d 212, 216 (D.C.Cir.1995) (rejecting shareholder's argument that OTS is barred from enforcing agreement to maintain bank's net worth under Section

1818(b); "[t]his is not a suit for breach of contract ... OTS is here pursuing an administrative remedy and need only have some affirmative grant of authority to do so."), *cert. denied,* 516 U.S. 1073, 116 S.Ct. 775, 133 L.Ed.2d 727 (1996).

The bankruptcy court also based its conclusion that subsection (*o*) requires an enforceable contract on the language of the section heading. Thus, the court noted that

> The subsection itself, which still appears under the executory contract section of the Code, contains nothing to indicate that it will operate on any obligation that is not embodied within such an enforceable contract. It only applies, like the other subdivisions of § 365, to executory contracts and unexpired leases....

*Overland Park,* 217 B.R. at 890. The Court believes that the bankruptcy court's analysis on this score was misguided. The fact that the section heading contains the phrase "executory contracts," and that the other subsections address executory contracts, does not establish that subsection (*o*) only applies to such contracts. To the contrary, the mandatory language of subsection (*o*) clearly places a limitation on the broad powers the trustee would ordinarily have in the case of an executory contract or unexpired lease. *See* 11 U.S.C. § 365(a).[17]

An analysis of the legislative history of Section 365(*o*) puts the section heading and the language of subsection (*o*) in prop-

---

**17.** Section 365(a) provides that, "[e]xcept as provided in sections 765 and 766 ... and in subsections (b), (c) and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." One might argue that subsection (a), by its own language, expressly defines the exceptions to the trustee's powers to assume or reject executory contracts under Section 365. The Court rejects this notion, however. One need conduct only a brief examination of other subsections of Section 365—the language and organization of which leave much to be desired—to realize the difficulty of comprehending the

language of the section, let alone its scope and applicability. *See, e.g.,* 11 U.S.C. § 365(f)(1). Indeed, the various subsections contain nine occurrences of the word "except," eight occurrences of the word "notwithstanding," and far more occurrences of the conjunctive "but."

In any event, the mandatory nature of the language in subsection (*o*) indicates that that subsection is not technically an exception to the trustee's power of assumption or rejection, but rather, an express limitation in the unique circumstances where a debtor has made a specific commitment to a Federal regulatory agency.

er context. Congress enacted Section 365(o) as part of the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act ("TBFA"), which constitutes Title XXV of the Crime Control Act of 1990. *See* Pub.L. No. 101–647, § 2522(c), 104 Stat. 4789, 4866–67. Congress's apparent intent in passing the TBFA was "to prevent institution-affiliated parties from using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution." *Firstcorp*, 973 F.2d at 246 (quoting H.R.Rep. No. 681(I), 101st Cong., 2d Sess. 179 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6585).

The Fourth Circuit has opined that Congress "accomplished this goal through § 365(o), which 'prevent[s] the trustee from rejecting any such commitment as an executory contract under his usual avoidance powers' pursuant to 11 U.S.C. § 365(a)." *Id.* (quoting H.R.Rep. No. 681(I) at 180, *reprinted in* 1990 U.S.C.C.A.N. at 6586 (footnote omitted)). *See also* 8 Norton Bankr.L. & Prac.2d (1998 Supp.), Sec. VI, 11 U.S.C.A. 365(o) (Editor's Comment: Section 365(o) was added as part of banking law enforcement provisions of Crime Control Act of 1990 "in order to eliminate the ability of a financial institution as a debtor to reject any commitment with the FDIC or similar government agency to maintain capital levels.").[18]

The bankruptcy court interpreted the legislative history to mean that subsection (o) prevents the trustee from exercising its power of rejection with respect to net worth maintenance commitments which take the form of executory contracts. The bankruptcy court opined:

> Referring specifically to § 365(o), the history states: "The effect of this provision is to prevent the trustee from rejecting any such commitment as an executory contract under his usual avoidance powers." While this statement indicates an intention to do away with the "rejection" of executory contracts where such commitments are concerned, it does not dispense with "executory contracts" as the non-bankruptcy law obligations that the new statute must operate on.... [T]he legislative history does not prove that ... Congress intended § 365(o) to jettison the need to find an enforceable executory contract.

217 B.R. at 890 (citing H.R.101–681(I), 101st Cong. § 2123(b) (1990); and noting inaccuracy of term "avoidance," which technically should be "rejection").

The Court believes that a more reasonable interpretation of the legislative history is that Section 365(o) prevents the trustee from rejecting any capital maintenance commitment simply by characterizing it as an "executory contract" pursuant to the trustee's usual rejection powers under Section 365(a). Thus, contrary to the bankruptcy court's conclusion, Section 365(o) is not limited to enforceable executory contracts, but instead, clarifies that net worth maintenance commitments are not subject to the trustee's "usual avoidance [i.e., rejection] powers" pursuant to Section 365(a).

The Court's interpretation finds support in the Fourth Circuit's decision in *Fir-*

---

**18.** The term "executory contract" as used in Section 365 is not defined in the Code. "The legislative history for that section indicates only that an executory contract is one on which performance remains due on both sides...." *In re KAR Dev. Assocs.*, 180 B.R. 629, 634 and n. 6 (D.Kan.1995) (quoting report of Senate Judiciary Committee discussing § 365, which stated that "[t]hough there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides." *See* S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5844). *See also Guaranty Nat'l Ins. Co. v. Greater Kansas City Transp., Inc.*, 90 B.R. 461, 463 (D.Kan.1988) (executory contract is generally defined as contract under which obligations of both bankrupt and other party to contract are so far unperformed that failure of either to complete performance would constitute material breach excusing performance of other); *In re Pacific Express, Inc.*, 780 F.2d 1482, 1487 (9th Cir. 1986); Countryman, *supra.*

*stcorp,* 973 F.2d 243, a case which the bankruptcy court discussed at length. In that case, Firstcorp, Incorporated, sought to acquire First Federal Savings and Loan Association of Raleigh, North Carolina (FF–Raleigh) in March 1985. The FHLBB approved Firstcorp's acquisition, subject to several conditions. One condition required Firstcorp to maintain FF–Raleigh's capital at or above a specified level. In January 1900 Firstcorp sought from OTS a "temporary forbearance" from the capital maintenance obligation. OTS denied the request, and directed Firstcorp to bring FF–Raleigh into compliance through a capital infusion; Firstcorp, however, failed to comply. In November 1990, OTS and FF–Raleigh entered into a consent agreement. That agreement—in which FF–Raleigh acknowledged that it had insufficient capital—provided that "[n]othing in this Agreement ... shall serve to preclude Firstcorp from honoring its net worth maintenance obligations...." *Firstcorp,* 973 F.2d at 245. OTS also served Firstcorp with a cease and desist order pursuant to 12 U.S.C. § 1818(c), which required Firstcorp to undertake certain capital-related actions in partial satisfaction of its capital maintenance obligation.[19]

On December 5, 1990, Firstcorp filed for injunctive relief from the cease and desist order in federal district court and, on the following day, filed a petition for bankruptcy under Chapter 11. On December 7, 1990, OTS placed FF–Raleigh in receivership.

In March 1991, both OTS and the RTC asked the bankruptcy court to order Firstcorp to assume its commitment and immediately cure the deficiency in the capital maintenance obligation pursuant to Section 365(*o*). The bankruptcy court denied the motions, concluding that the commitment "expired by its own terms" upon the bankruptcy filing. *Id.* at 246. On appeal, the district court reversed. Concluding that Section 365(*o*)'s immediate cure requirement attaches at the moment of the bankruptcy filing, the district court held that appointment of the RTC as receiver of FF–Raleigh did not relieve Firstcorp of the obligations imposed under Section 365(*o*) at the time of the bankruptcy filing. The district court remanded to the bankruptcy court, directing it to grant the relief which the RTC and OTS sought.

On appeal to the Court of Appeals, Firstcorp argued that Section 365(*o*) does not require a cure immediately upon the filing of a Chapter 11 petition for bankruptcy because other provisions of the Bankruptcy Code, unlike Section 365(*o*), explicitly establish the filing of a petition as the operative event for certain statutory purposes. Firstcorp further argued that the parenthetical language in the first sentence of Section 365(*o*) requires that any cure of a deficit under a capital maintenance commitment be accorded priority only according to Section 507(a); and that requiring a cure immediately upon the filing of a Chapter 11 petition would be inconsistent with the eighth [now ninth] priority under Section 507 (*see* 11 U.S.C. § 507(a)(9)), because it would impermissibly allow such a claim to jump ahead of those with superior priority under Section 507(a).

After engaging in a detailed analysis of the language of Section 365(*o*), the Fourth Circuit rejected Firstcorp's arguments. The court concluded that the requirement of an immediate cure of a deficit under a capital maintenance commitment is a pre-

---

**19.** Under 12 U.S.C. § 1818(b), OTS is empowered to issue cease and desist orders to any depository institution for violating a "condition imposed in writing by the agency in connection with the granting of any application or other request by the depository institution or any written agreement entered into with the agency" and may order the deposito-ry institution to take affirmative action to correct the conditions resulting from the violation. Pending the completion of such proceedings, under Section 1818(c) OTS is further empowered to issue a temporary order requiring the institution to cease its violation or practice and to take affirmative action to prevent or remedy the potential harm.

requisite to reorganization under Chapter 11, and not an ordinary expense or claim subject to the priority scheme in 11 U.S.C. § 507(a). The policy behind the statutory requirement, the court noted, is straightforward:

In the [TBFA], Congress determined that a depository institution holding company that has committed to maintain the capital of a depository institution subsidiary that has become unprofitable cannot use a Chapter 11 reorganization to jettison the subsidiary in an effort to enhance its own financial position and that of its creditors, while leaving the federal deposit insurance system (and ultimately the taxpayers) to bail out the capital-deficient subsidiary. If the holding company is not financially able to satisfy its capital maintenance obligations, then § 365(o) denies it the opportunity to reorganize under Chapter 11, leaving liquidation under Chapter 7 as its only option. Through this mechanism, § 365(o) places the financial interest of the federal deposit insurance system ahead of that of the holding company and its creditors.

973 F.2d at 248. Accordingly, the court held that the capital maintenance obligation was a commitment which required Firstcorp to cure FF–Raleigh's capital deficit "immediately" upon its Chapter 11 filing, and that placement of FF–Raleigh in receivership did not absolve Firstcorp of the obligation which existed at the date of the Chapter 11 filing. *See Firstcorp*, 973 F.2d at 246–48.[20]

The Court's interpretation finds further support in OTS's broad regulatory authority in this realm. *See, e.g.*, 12 U.S.C. § 1818(b)–(c) and 12 U.S.C. §§ 1464(s)(1) and 1464(s)(4).[21] In *Kaneb*, for example, the Fifth Circuit held that the FSLIC's conditional approval of the acquisition of a savings association, subject to a condition limiting the amount of dividends the savings association could pay in any fiscal year, was a proper course of action in lieu of the FSLIC's express authority to deny the application, and was consistent with its overall authority to regulate holding companies. Moreover, the FSLIC's action corresponded directly with its statutory duty under 12 U.S.C. § 1730a(e)(1) (now § 1467a(e)(1)) to consider the financial resources and future prospects of the institutions involved before granting the application. The court noted that "Congress has delegated broad authority to the FSLIC over acquisitions of insured institutions," including "the discretionary power to impose a dividend restriction." 650 F.2d at 82. It is clear, the court further noted, that

the intent of Congress was to give the FSLIC authority to impose conditions upon approval of an acquisition by a savings and loan holding company. Otherwise, it would not have been necessary to give authority to the FSLIC to initi-

---

**20.** Noting the bankruptcy court's reservation of the question whether Firstcorp's capital maintenance commitment was enforceable, the court further held in dicta that "[a] capital maintenance obligation imposed as a condition of FHLBB's approval of an acquisition ... is clearly enforceable by OTS under settled law." *Firstcorp*, 973 F.2d at 250 n. 6 (citing *Kaneb Servs., Inc. v. Federal Svgs. & Loan Ins. Corp.*, 650 F.2d 78 (5th Cir.1981)).

**21.** 12 U.S.C. § 1464(s)(1) provides that

Consistent with the purposes of [12 U.S.C. § 3907] ... the Director shall require all savings associations to achieve and maintain adequate capital by—

(A) establishing minimum levels of capital for savings associations; and
(B) using such other methods as the Director determines to be appropriate.

12 U.S.C. § 1464(s)(4) provides that

the Director may issue a directive requiring any savings association which fails to maintain capital at or above the minimum level required by the Director to submit and adhere to a plan for increasing capital which is acceptable to the Director.... Any directive issued and plan approved ... shall be enforceable under [12 U.S.C. § 1818] to the same extent and in the same manner as an outstanding order which was issued under [12 U.S.C. § 1818] and has become final.

ate cease and desist proceedings for violation of "any condition in writing imposed by the (FSLIC) in connection with the granting of any application."

*Id.* (citing 12 U.S.C. § 1730(e)(1) (now § 1467a(e)(1))). *See also Firstcorp,* 973 F.2d at 250 n. 6 ("[a] capital maintenance obligation imposed as a condition of FHLBB's approval of an acquisition, however, is clearly enforceable by OTS under settled law.") (citing *Kaneb* ).

## II. Allowance of OTS Proof of Claim

The bankruptcy court noted in its Memorandum Opinion that the Partial Pretrial Order in the case consolidated for decision the allowance of OTS's proof of claim and the merits of OTS's motion to cure the deficit under the net worth maintenance stipulation or to dismiss the case under 11 U.S.C. § 1112(b)(2). As noted above, the Court has determined that Section 365(*o*) requires the debtor-in-possession of the bankruptcy estate to meet its obligation under the net worth maintenance stipulation in order to proceed under Chapter 11. In that regard the decision of the bankruptcy court is reversed. This holding disposes of the issue whether the bankruptcy court erred in holding that Financial's stipulation is not a capital maintenance commitment subject to Section 365(*o*), and whether it further erred in denying OTS's motion pursuant to Section 365(*o*) for an order requiring an immediate cure of the deficit.

22. This position is somewhat difficult to square with the OTS position that in lieu of an order reversing and remanding to the bankruptcy court, this Court should enter an order which requires Financial to cure as much of the deficit under its capital maintenance commitment as possible and orders dismissal of the case. If the case is dismissed, any issue concerning the OTS proof of claim would appear to be hypothetical at best.

23. If the issue should arise again in this venue, the Court would appreciate a more cogent explanation as to why OTS has standing to assert an unsecured priority claim for $4,073,000.00 in the first place. The Bank-

As noted above, OTS also appeals the bankruptcy court's decision to disallow its proof of claim.[22] The parties, however, agree that a determination requiring Financial to comply with Section 365(*o*)'s immediate cure requirement would exhaust the bankruptcy estate and make it impossible for Financial to effectuate a plan or reorganization. Also, OTS acknowledges that it incurred no losses that are compensable under Financial's stipulation to maintain OPSL's capital. Therefore it appears to the Court that its holding with respect to the duty to cure renders moot any issue regarding the allowance of OTS's proof of claim. The Court therefore declines to further address this issue.[23]

In conclusion, the explicit mandatory language of Section 365(*o*) of the Bankruptcy Code requires Financial, as debtor-in-possession of the bankruptcy estate, to immediately cure the deficit under Financial's stipulation to maintain OPSL's net worth. Accordingly, until Financial has fulfilled its obligation under its stipulation, it is precluded from proceeding under Chapter 11. *See Firstcorp,* 973 F.2d at 248 ("[i]f the holding company is not financially able to satisfy its capital maintenance obligations, then § 365(*o*) denies it the opportunity to reorganize under Chapter 11, leaving liquidation under Chapter 7 as its only option.").

## III. Financial's Statement of "Additional Issues" on Appeal

On February 20, 1998, OTS filed its *Statement Of Issues And Designation Of* ruptcy Code defines a "claim" as a "right to payment" or a "right to an equitable remedy for breach of performance, if such breach gives rise to a right of payment...." 11 U.S.C. § 101(5). Financial stipulated to OTS's predecessor (FSLIC) that in return for FSLIC's approval of its proposed acquisition of OPSL, Financial would maintain the net worth of OPSL. Based on that stipulation, it would appear that the right to enforce the stipulation belongs to the RTC, as OPSL's conservator, and not to OTS. The Court does not understand why OTS would be entitled to collect the $4,073,000.00 which was intended to maintain the net worth of OPSL.

*Record On Appeal* (Doc. # 241 filed in *Overland Park*, Case No. 94–21190). On March 4, 1998, Financial filed its purported *Statement Of Additional Issues On Appeal* (Doc. # 242 filed in *Overland Park*, Case No. 94–21190). On March 18, 1998, OTS filed its *Motion To Strike Appellee Overland Park Financial Corporation's Statement Of Additional Issues On Appeal Or, In The Alternative, To Strike Issue C Therefrom And For Related Relief* (Doc. # 3). On July 31, 1998, this Court issued an order which sustained that motion. *See Order* (Doc. # 7). The Court ruled that Financial lacked standing to inject additional issues on appeal because it did not file a cross-appeal. *See id.* at 1. The Court also ruled that "[t]o the extent that its arguments fit within the issues delineated by [OTS], [Financial] is of course free to present them to the Court on appeal." *Id.*

In its appeal brief, OTS argues that each of Financial's "five objections or affirmative defenses" are meritless. *See Brief Of Appellant, The Office Of Thrift Supervision (Doc. # 12), filed November 16, 1999, at 31–49. OTS also notes, however, that due to the nature of the bankruptcy court's disposition of this matter, "the bankruptcy court did not address these defenses."* Id. at 31. In its own appeal brief, Financial argues that because OTS has proffered arguments on Financial's affirmative defenses, "OTS can no longer argue that [Financial's] arguments based on its affirmative defenses are not properly before this Court on appeal." Brief Of Appellee Overland Park Financial Corporation (Doc. # 15) filed January 19, 1999, at 25.

The Court disagrees. The *Statement Of Issues And Designation Of Record On Appeal* which OTS filed on February 20, 1998, does not delineate any issues related to Financial's purported affirmative defenses. The simple fact that OTS has presented arguments on those issues in its appeal brief does not mean that those issues are properly before this Court. Moreover, the bankruptcy court did not reach those issues in its Memorandum Opinion which is the subject of this appeal. Accordingly, the Court will not address Financial's purported affirmative defenses.

Based on the foregoing analysis, the Court **REVERSES** the bankruptcy court's holding that the net worth maintenance stipulation which Overland Park Financial Corporation made in connection with its acquisition of Overland Park Savings & Loan Association is not a capital maintenance commitment subject to 11 U.S.C. § 365(*o*), and holds that Overland Park Financial Corporation, as debtor-in-possession of the bankruptcy estate, must immediately cure the deficit under its net worth maintenance stipulation. This matter is therefore **REMANDED** to the bankruptcy court for further proceedings not inconsistent with this opinion.